The WASHINGTON LEGAL CLINIC FOR THE HOMELESS, INC., et al., Plaintiffs,

v.

Marion BARRY, in His Official Capacity as Mayor of the District of Columbia, Defendant.

Civil A. No. 93–0691 (JHG).

United States District Court, District of Columbia.

Feb. 23, 1996.

Gary Lester Ivens, Federal Trade Commission, Bureau of Consumer Protection, Washington, DC, Katherine Dwyer McManus, Mark Douglas Wegener, Peder A. Garske, Martin F. Cunniff, Jill A. Tuennerman, Howrey & Simon, Washington, DC, Joanne E. Caruso, Howrey & Simon, Los Angeles, CA, for Washington Legal Clinic for the Homeless, Father McKenna Center of St. Aloysius Church, Frank Trinity, Lisa Goode, Patricia Kennedy, Diann Hammer, Sunny Kim, Franzin Melton, Angelina Easter, Tomikio Hall, Koya Harleston, Debra King, Tammy Montague.

Jesse P. Goode, Department of Human Services, Office of General Counsel–St. Elizabeths, Washington, DC, George C. Valentine, Office of Corporation Counsel, D.C., Washington, DC, for Sharon Pratt Kelly, in her official capacity as Mayor of Washington, District of Columbia, Marion Barry, Jr.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

For nearly four years, plaintiffs, who are homeless families[1] and their advocates, have strived to reform the District of Columbia's system for providing emergency housing assistance to homeless families, contending that the present system violates families' rights under the First and Fifth Amendments to the United States Constitution.[2] During the pendency of this case, a number of events have occurred, some of which, such as the institution of the present waiting list system for allocating shelter have, in this Court's view, improved matters. Other events have clearly operated to the detriment of homeless families, most significantly the District's decision to withdraw from the federal Emergency Assistance reimbursement program, which deprived the District of substantial resources with which to house homeless families.

Following resolution of several claims through dispositive motions, plaintiffs' remaining claims, concerning due process and equal protection, were the subject of a four-day bench trial. Following the trial, the parties submitted extensive proposed find-

---

1. A class consisting of homeless families seeking eligibility determinations for emergency family shelter after November 1, 1991 was certified on April 15, 1994. See Memorandum Opinion and Order (Apr. 15, 1994) at 2 n. 2.

2. This case was initially brought in 1992 (C.A. No. 92–1894), and involved allegations of First Amendment violations by the District of Columbia in restricting advocates' access to the family intake center at 25 M Street, S.W. That case was settled following negotiation of a Memorandum of Understanding governing access to the intake center.

In April 1993, plaintiffs brought the instant action, alleging, inter alia, violations of plaintiffs' First and Fifth Amendment rights, in connection with the District's operation of its emergency family shelter program. Several months later, plaintiffs moved for a preliminary injunction. On the eve of the preliminary injunction hearing, the District filed a notice stating that the issue was moot due to the District's withdrawal from the federal reimbursement program for emergency family shelter. Plaintiffs' motion was subsequently denied, largely due to the District's withdrawal from the federal program.

In April 1994, the Court issued a Memorandum Opinion and Order dismissing Counts I and II from the Complaint, and certifying a class consisting of all families seeking eligibility determinations after November 1, 1991.

In March 1995, the Court issued a Memorandum Opinion and Order finding in defendant's favor on plaintiffs' claim concerning First Amendment violations relating to access to the courts; finding partly in plaintiffs' favor and partly in defendant's favor on the First Amendment challenges to the District's policies concerning access to the intake office by advocates; and denying summary judgment on plaintiffs' due process and equal protection claims due to disputes of material fact.

In that same Memorandum Opinion and Order, the Court found in plaintiffs' favor on the issue of defendant's violation of its own laws, which obligated the District to participate in the federal Emergency Assistance reimbursement program so long as the District operated an emergency family shelter. The District withdrew from the program in July 1993, and the Court found that the Mayor's failure to participate in the federal reimbursement program constituted a clear violation of District law. On or about April 11, 1995, however, the City Council passed, and Mayor Barry signed, emergency legislation making the District's participation in the federal reimbursement program discretionary rather than mandatory. Nonetheless, the Court issued a Declaratory Judgment stating that from the period July 1, 1993 until April 11, 1995, defendant was in violation of D.C.Code Ann. § 3–206.3(a).

ings of fact and conclusions of law.[3]  Upon consideration of the record and evidence introduced at trial, including the testimony of witnesses whose credibility, demeanor, and behavior the Court has had an opportunity to observe and evaluate, judgment shall be entered in favor of plaintiffs in part and against defendant in part, and in favor of defendant in part and against plaintiffs in part, for the reasons set forth below.

## I.  FINDINGS OF FACT

### A.  Characteristics and Consequences of Homelessness

At trial, plaintiffs presented uncontroverted testimony concerning the typical characteristics of homeless families, as well as the effects of homelessness on parents and their children.  Homeless families are in a crisis situation, and exist in an extremely vulnerable state.  Typically they are destitute, with no financial resources, no housing or inadequate housing, and no means of transportation.

Many families applying for emergency shelter are homeless because they have been evicted, have been forced to leave an unsafe or overcrowded housing situation, or were fleeing domestic violence or another type of family dispute.

Homelessness can have devastating mental and physical consequences.  Homeless families are exposed to the elements of heat, cold, snow, and rain.  They lack basic privacy and facilities necessary for proper hygiene, and often lack proper nutrition.  The problem of poor nutrition is especially acute for home-

less children, and particularly infants, due to difficulties in refrigeration of formula and lack of privacy for breast feeding.

Homeless families are at an increased risk of illness.  Often they have reduced resistance to illness, and face an increased danger of infectious diseases, upper and lower respiratory illnesses, intestinal infections, and other health problems.  Homeless families have a rate of hospitalization many times higher than the general population.  Moreover, homelessness adversely impacts pregnancy and prenatal care.  Homeless women have a higher incidence of low birth-weight babies and infant mortality than other populations.  Homelessness can cause serious psychological problems as well, including depression, the consequences of which obviously can be severe.

### B.  The Emergency Shelter Family Program

The District of Columbia[4], through the Office of Emergency Shelter and Support Services ("OESSS"), operates an emergency shelter program for homeless families.[5]  OESSS is part of the Department of Human Services ("DHS" or "the Department"), the same department responsible for administering Aid to Families with Dependent Children ("AFDC") and other social services programs.[6]

The regulations governing administration of the emergency shelter program are contained at 29 DCMR Chapter 25, and became effective on January 24, 1992.[7]  Pursuant to

---

3.  At the outset, the Court compliments counsel for their thorough and very helpful submissions.  Significantly, the parties' submissions confirm the Court's observation at trial that most factual matters are not disputed in this case—rather, what is hotly disputed is the legal significance of the facts.  Because most facts in the record are not disputed, this Memorandum Opinion and Order presents most of the Court's factual findings without specific attribution to a particular witness.

4.  As with prior Opinions, because defendant Mayor Marion Barry is sued in his official capacity, the Court frequently refers in this Opinion to defendant as "the District."

5.  On May 1, 1995, the program was transferred to the Community Partnership for the Prevention

of Homelessness, a public-private partnership.  However, the parties stipulated that the Department of Human Services retains ultimate legal responsibility for the operation, management and administration of the program, including fair hearings on appeal.  The program still operates out of the OESSS offices at 25 M Street, S.W.

6.  Prior to May 1, 1995, the OESSS office was headed by Helen Keys.  Ms. Keys delegated responsibility for daily operations at OESSS to Pamela Shaw, who held the position of Chief Supervisor of the Intake staff.

7.  The eligibility criteria contained in the regulations were developed by the District of Columbia and not the federal government.  However, during the period of time that the District participat-

the regulations, families meeting certain criteria are eligible to receive emergency shelter.[8] The governing statute and regulations explicitly state that eligibility does not entitle applicants to shelter. Significantly, however, Pamela Shaw testified as corporate representative for the District of Columbia that it is OESSS' policy and practice to provide shelter to *all* homeless families at the point they are deemed eligible.[9] In general, applicants are eligible for shelter if they have no present housing, lack the financial resources to obtain housing[10], and have not been placed in emergency shelter in the previous 365 days.[11] 29 DCMR Ch. 25 § 2502.[12]

According to the regulations, at the time of initial application or inquiry, OESSS staff are to "inform the applicant that he or she is required to provide documentation of eligibility that is reasonably available to the applicant." 29 DCMR Ch. 25 § 2503.1. The regulations do not define "reasonably available." Under the regulations, DHS is permitted to require an applicant to provide a variety of information to verify eligibility, *id.* § 2503.10, including, *inter alia,* an eviction notice, Social Security number, income and source of income, statements regarding the applicant's need for shelter, information regarding other persons in the family unit, and "[o]ther information deemed necessary to es-

tablish eligibility." *Id.* The regulations do not permit OESSS to deny services on the night of initial application due to a lack of available documentation. *Id.* § 2503.2.

According to the regulations, "[t]he Department shall provide an applicant with an oral and written notice of eligibility determination at the time of the determination." *Id.* § 2502.4. Applicants who are aggrieved by the Department's decision to deny housing may request a fair hearing from the Department's Office of Fair Hearings, unless the denial of shelter is due to a lack of space. *Id.* § 2511.1–2. The regulations require applicants to request a hearing within 10 days of a decision on eligibility. *Id.* § 2511.5. A recommended decision is to be rendered within five days of a hearing, *id.* § 2511.12; however the regulations do not specify a time frame within which such hearings must take place or by which a final decision must be issued. Finally, the regulations provide for informal administrative review prior to a formal hearing, upon the request of the applicant. *Id.* § 2512.

It is undisputed that OESSS does not have a formal policy manual for operating the emergency shelter program. Pamela Shaw testified that the regulations operate as a policy manual.[13] Ms. Shaw further testified

ed in the federal Emergency Assistance reimbursement program, federal auditors evaluated the District's performance in part based on how accurately the District applied its own eligibility requirements. Ms. Shaw presented unrebutted testimony that the federal government refused to reimburse the District for shelter expenses incurred prior to a determination of eligibility in accordance with the District's regulations.

8. Emergency shelter family housing units contain cooking facilities, bathroom facilities, separate sleeping quarters for adults and minor children, and access to outside play areas.

9. As described more fully *infra*, OESSS delays making an eligibility determination until a potential housing arrangement has been identified for a particular applicant.

10. The regulations define financial ability to obtain housing as financial resources greater than $100, a valid credit card, or income greater than a maximum allowable income.

11. The regulations plainly state that applicants who have received shelter in the previous 365 days will be denied shelter unless they present

mitigating circumstances justifying a different result. Mitigating circumstances are defined in the regulations to include risk to health of children. Frank Trinity, former staff attorney for the Washington Legal Clinic for the Homeless ("WLCH"), testified that in his extensive experience assisting families, in no case has OESSS considered mitigating circumstances at the outset of the application process. Ms. Shaw confirmed that the instances in which OESSS considered mitigating circumstances were infrequent. Plaintiffs presented cases where, on appeal, OESSS was directed to consider mitigating circumstances.

12. The regulations contain other requirements, such as being current on District income taxes and not having a prior record of eviction for drug use. 29 DCMR Ch. 25 § 2502.1(d) and (e). These requirements were not challenged in this litigation.

13. Frank Trinity testified that a policy manual would be useful in setting forth ground rules and providing an up-to-date, public source of OESSS' requirements. The absence of a policy manual is one of plaintiffs' major criticisms of the intake system.

that she personally trained both current and new OESSS employees regarding OESSS procedures. New employees participate in a 30–day training and orientation program which includes weekly meetings, hands-on training, and observation and evaluation by Ms. Shaw.

### 1. *Prior System for Allocating Shelter*

The District's system for allocating emergency shelter to families has varied significantly over the years. Between January 1992 and January 1994, the District followed a system whereby applicants were considered and placed on a first-come, first-served basis until all spaces available on a particular day were filled. Families who applied after all available spaces were filled were not provided an individualized eligibility determination, but were issued a pro forma denial for lack of space.[14] Applicants were thus required to reapply each day in order to be considered for shelter.[15] The system created an incentive for applicants to arrive as early as possible at OESSS in order to be among the first in line when the office opened in the morning. In some cases, families camped out overnight at 25 M Street in order to be among the first in line for shelter.

### 2. *The Waiting List System*

The system for allocating shelter changed substantially in January 1994, when the District halted its practice of allocating shelter on a daily first-come, first-served basis, and switched to a waiting list system. Under the waiting list system, as reflected in Pl.Exh. 275 and as described by numerous witnesses, applicants are given an application, including a screening form, upon their arrival at the OESSS office. The screening form contains "yes or no questions surrounding the objective aspects of a family's eligibility for shelter." Pl.Exh. 175. OESSS workers review the screening form and application for possible eligibility problems. If potential problems exist, further inquiry is made and a decision on eligibility is rendered.[16]

If no apparent barriers to eligibility exist, the applicant is given a waiting list number and is instructed to telephone a recording at OESSS each day after 10:00 a.m.[17] The recording states the waiting list numbers to be served on a given day. It does not recite waiting list numbers called on prior days but not claimed.

Applicants whose numbers are called are instructed to present themselves at OESSS by 1:00 p.m. that day to be placed. OESSS' policy is to hold a case file open for 14 days from the date a number is called. If an applicant does not present him or herself within 14 days, the file is closed and the applicant is required to reapply for benefits. The 14 day window is not explained on the forms given to homeless family applicants.

The waiting list system is not free of problems. According to Sister Mary Ann Luby, an outreach worker for WLCH, the recording is not always changed by 10:00 a.m. In addition, on occasion the recording malfunctions. Plaintiffs complain that these prob-

---

14. As discussed previously, the regulations do not authorize an appeal where a denial is for lack of space.

15. The testimony of Tammy Montague, a class representative, is illustrative of the former system. Ms. Montague visited OESSS on three consecutive days. On the first two days, she was notified that no space was available. On the third day, Ms. Montague was interviewed for eligibility, but was denied because she had received shelter during the previous year. No mitigating circumstances were found in her case, despite the fact she had a two-week old baby, another child with a leg defect, and that Ms. Montague herself was ill and hemorrhaging.

16. Scott McNeilly, staff attorney for the Washington Legal Clinic for the Homeless, testified that some families are told that they must provide further documentation before they can be given a waiting list number. No specific examples of this practice were provided by plaintiffs; however, such a practice could certainly be viewed as consistent with the policy, as described on the form, of conducting further evaluation of applicants whose screening form reflects possible barriers to eligibility.

17. The deposition testimony of Junetta Hill and Cynthia Blount, two shelter applicants, reveals that families on the waiting list do not necessarily follow the instruction to call the recording each day. In Ms. Blount's case, she failed to call the recording and missed the announcement of her waiting list number. When she later visited the OESSS office after more than 14 days, she was told she would need to reapply.

lems create difficulties for homeless families, as does the fact that OESSS does not directly contact families when their numbers come up.[18] Only about fifty percent of the applicants whose numbers are called actually return to OESSS for placement.

Eligibility determinations are not performed at the time an applicant is placed on the waiting list. Instead, an eligibility determination is made at the time the applicant's number is called, prior to actual placement into shelter. As a result, families on the waiting list but not yet approved for shelter do not receive services given to families actually placed in emergency shelter. Families placed in shelter receive referrals to other social services, as appropriate, an opportunity to attend classes in the Regional Resource Center, assistance in obtaining permanent housing, and case management services.[19] Moreover, because an eligibility determination is not made at the time of application, applicants on the waiting list are not referred to Healthcare for the Homeless, a free medical clinic operated at 25 M Street, S.W. Finally, families placed in emergency shelter receive priority placement on the waiting list for permanent housing maintained by the Department of Public and Assisted Housing ("DPAH").[20]

### 3. *Capacity of the Program*

The District unquestionably does not have the financial resources to serve all eligible families who need emergency shelter. At the time of trial, families waited an average of two months from the time they were placed on the waiting list to be placed in emergency shelter. This wait is no doubt

exacerbated by the fact that the number of available shelter spaces has plummeted in recent years, from 495 spaces in the fall of 1994 to 139 spaces at the time of trial.

Undoubtedly the District's withdrawal from the federal Emergency Assistance reimbursement program effective July 1, 1993, operated to reduce significantly the number of spaces available for eligible families. Moreover, plaintiffs contend that the District's mismanagement of its public housing programs contributes to the inability of OESSS to move families from temporary shelter to permanent housing, thereby freeing up temporary shelter space. According to Patricia Mullahy Fugere, WLCH's Executive Director, at the time of trial, the Department of Public and Assisted Housing had 2360 vacant permanent public housing units. DPAH has been severely criticized for mismanagement of the public housing program.

In sum, when one considers the substantial delay between application for shelter and eventual placement, and the extremely modest number of emergency shelter units presently available, it is evident that the District does not have <u>emergency</u> shelter readily available to families in need.[21]

### C. *Documentation Requirements*

Consistently since June 1991 to the present, the District has had a policy of requiring homeless families to provide documentation of their eligibility. The specific documentation requirements have changed over the years.

---

**18.** In their depositions, Junetta Hill and Cynthia Blount indicated that although they did not call the recording each day, they frequently got information from staff at the Community for Creative Non Violence concerning the waiting list numbers called on a given day.

**19.** Case management services are provided through personnel at the shelter at which a family is placed, not directly by OESSS staff.

**20.** The District contends that *all* homeless families, not just those in emergency shelter, receive the same priority on the DPAH list. Plaintiffs contend that homeless families in emergency shelter get greater priority. Not enough infor-

mation was elicited at trial to enable the Court to make a finding on this issue which, while important, is not pivotal to plaintiffs' claims.

**21.** The Court heard testimony at trial suggesting that the District does provide minimal shelter to families in need, at least during cold weather, at Hagan Hall on the grounds of St. Elizabeth's Hospital. However, it was unclear whether shelter at Hagan Hall was always available to families. Moreover, a number of witnesses testified, either in person or through deposition testimony, that they resided at the Community for Creative Non–Violence during their pendency on the waiting list for emergency shelter.

Beginning in June 1991, OESSS workers distributed a form to applicants which provided as follows:

"All Applicants for Family Shelter"

When applying for shelter—

All applicants will need the following:

------------------------------

*Notarized Statement
Referral
Eviction Notice
Writ

*Statement of Income (i.e., SSI Income, AFDC Eligibility)
W–2
Statement of Earnings/Pay Stub

*Birth Certificates (*adults and children*)

*Social Security Cards (*adults and children*)

*Picture ID

**All* children must be present at the time of intake

Pl.Exh. 31A.

Applicants were not given any materials explaining the document requirements or stating that applicants could still be found eligible for shelter if they lacked documentation.

As shown in Pl.Exh. 31A, initially OESSS required applicants to supply notarized statements concerning the reasons for their homelessness. Plaintiffs contend, and the Court agrees, that the notarized statement requirement imposed a burden on families, due to the difficulty and expense of obtaining a notarization and the difficulty in traveling to get the statement.[22] The District deleted the reference to notarized statements in March 1993. Pl.Exh. 129.

In or around January 1994, the District began giving applicants the "Family Intake Document Checklist," Pl.Exh. 175, which OESSS staff would mark to indicate which documents were needed to verify an applicant's eligibility.[23] The Document Checklist states that documents are to be provided within seven days, and witnesses for plaintiffs testified that applicants were notified to that effect. Chief Supervisor Shaw testified on behalf of defendant that the seven-day requirement was not strictly enforced but rather was a means of expediting an eligibility determination once the applicant's waiting list number was called. However, no information concerning the consequences (or lack thereof) of failing to provide the documents is contained on the Document Checklist or other materials in the application packet.

**1.** *Effect of Lack of Documents on Receiving Shelter*

The parties' positions differ on the issue of whether shelter applicants may receive shelter if they lack the requisite documentation. Pamela Shaw testified that families are given contingent shelter placements even if they do not satisfy all the documentation requirements.[24] Plaintiffs insist, on the other hand, that OESSS staff strictly enforce the documentation requirements, require applicants

**22.** To support their allegations, plaintiffs sampled the OESSS case files, which consisted of approximately 9,000 files. Plaintiffs sampled one in 10 case files, resulting in a total sample of 859 applicant names. Of those files, in 198 cases, the file contained a notarized statement. In six instances, the file contained evidence of a request for a notarized statement.

Significantly, however, the data was not broken down to reflect whether applicants in the sampled files were ultimately approved or denied shelter. Thus, the data's value in evaluating the notarized statement requirement is minimal. In any case, the issue is moot in light of the District's changed policy.

**23.** The Family Intake Document Checklist contains the following listing of documents:

_____ Eviction notice
_____ Writ of Eviction
_____ Statement of Income (e.g. SSI income, AFDC eligibility, W–2, Statement of Earnings/Pay stub)
_____ Birth certificates (Adults *and* children)
_____ Social Security cards (Adults *and* children)
_____ Picture Identification card
_____ Statement from your last place of residence which establishes that you can no longer live there
_____ No additional documents are needed at this stage.

The form contains spaces for the applicant's signature as well as the signature of an eligibility worker. Pl.Exh. 175.

**24.** Ms. Shaw did not describe the consequences of failing to provide documentation during the contingent placement.

to produce all the information listed on the Document Checklist, and do not accommodate families who cannot obtain the documentation. Frank Trinity testified that he recalled "one or two" conditional placements in his experience.

The evidence presented from plaintiffs' sample of the OESSS case files actually supports the District's position. In four of the 859 case files evaluated, the case file indicated that an applicant was denied shelter for lack of documentation to verify eligibility. In 61 case files, however, applicants were placed contingent on verification. Thus, the Court finds that applicants who lack documents are, as a general rule, provided shelter contingent on providing documentation.

Plaintiffs contend that the District denies shelter on the grounds of failure to cooperate and assist in the eligibility verification process, which plaintiffs maintain is simply a code for lack of documentation. Plaintiffs complain that "failure to assist" does not differentiate between inability to assist and refusal to assist, and they contend it is improper to deny families for inability to assist in providing documentation. In contrast, Ms. Shaw testified on behalf of the District that applicants would not be denied shelter for an inability to provide documentation, but only a refusal to provide documentation. She did not elaborate further or provide specific examples to bolster her testimony.

To support their allegations that OESSS improperly denies applicants shelter for a lack of documentation under the pretense of "failure to assist," plaintiffs presented statistical evidence on the number of such denials in 1992 and 1993. While important evidence of the practice at the time, the Court does not find the evidence on this point particularly probative in light of its dated nature. In addition, the evidence suffers from internal weaknesses, as detailed in the margin.[25]

Plaintiffs did present contemporary examples of two applicants who apparently were denied shelter for failure to provide documentation.[26] However, plaintiffs' evidence is

---

**25.** For example, Pl.Exh. 156A shows that in an approximately four-month period of time between late March and early August, 1992, 240 families were denied shelter for failure to assist and cooperate. The Court observes that the documents introduced by plaintiffs in support of this point are confusing. In many instances, the total number of denials does not match the numbers listed next to each possible reason for denial. For example, the first page of Pl.Exh. 156A shows that 12 families were denied shelter that week. However, under "reasons for denial," eight families are listed for failure to assist and 10 are listed as having adequate sleeping arrangements. These mathematical errors diminish the probativeness of the evidence, as does the fact that the data is from 1992, well prior to the institution of the present waiting list system.

Plaintiffs also submitted information provided to WLCH in response to a Freedom of Information Act request, which listed the number of applicants denied shelter and the reason for denial for the period November 1, 1992—February 15, 1993. Pl.Exh. 1. Interestingly, very few applicants (9 applicants) were denied for "failure to assist with verification" during that time frame, especially when compared to other reasons for denial, such as "sheltered in previous year" (34 applicants) and "adequate sleeping arrangements" (123 applicants). There were 463 total applicants during this time frame. Thus, the number of applicants denied shelter for "failure to assist" is minimal in relation to the total number of applicants.

Finally, plaintiffs brought to the Court's attention, through the testimony of Frank Trinity, the situation of LaBarbara C., who was denied shelter in 1992 for failure to assist. Her eligibility determination form stated "lacks birth certificates, two of five Social Security cards, income statement, statement of homelessness."

**26.** Plaintiffs presented the case of Roylene S., who, along with her child, was removed from shelter at a safe haven for battered women in 1994 due to her failure to cooperate in the documentation process. In her case, the failure was a failure to produce her own Social Security card. This evidence was not contradicted at trial.

In another instance, Troven M. sought emergency shelter for herself and her three children. She applied for and received a waiting list number in August 1994. In September 1994, her family was placed contingent upon her obtaining documentation. She and her family were later removed from shelter for failure to cooperate in the documentation process, apparently because Troven M. failed to produce a birth certificate for one of her children.

Plaintiffs presented other examples of families whom they contend were improperly denied shelter for failure to meet the documentation requirements. After evaluation of the materials presented, the Court is not persuaded that sufficient information on those cases was presented to enable the Court to draw the conclusion urged

insufficient to establish that applicants are typically denied contingent placements when they lack the requisite documentation.[27]

### 2. Burdensomeness of Documentation Requirements

Plaintiffs contend that the District's documentation requirements impose unnecessary hardships on homeless families and may deter families from applying for emergency shelter.[28] Frank Trinity, former WLCH staff attorney, frequently informed DHS of his belief that the documentation requirements were too onerous. Additionally, plaintiffs' expert, Dr. Yvonne Rafferty, testified that she was not aware of a locality which imposed greater documentation requirements than the District of Columbia, and she contrasted the District's system with that of New York City, where minimal or no documentation is required and families in need are given shelter on demand.[29] In addition to challenging the overall burdensomeness of the requirements, plaintiffs focused on a number of specific issues, which are set forth below.

### a. Lack of Coordination Within DHS

One of plaintiffs' most serious criticisms of the present system concerns OESSS' failure, when making eligibility determinations, to utilize information already provided to other offices within DHS by applicants who are AFDC recipients. Homeless families seeking emergency shelter are typically single female heads of household with one or more children, and most are recipients of AFDC.[30] Plaintiffs contend that OESSS' failure to verify information through an applicant's AFDC file, or through a computer system known as the Automated Client Eligibility Determination System ("ACEDS"), constitutes an unreasonable burden in violation of due process.

Plaintiff Franzin Melton's testimony is illustrative of this point. When she applied for emergency shelter, Ms. Melton was required to provide proof of income, as well as Social Security cards and birth certificates for herself and her minor daughter. The documents were required even though Ms. Melton had an identification card from the AFDC program that included her name, date of birth and Social Security number. Ms. Shaw confirmed that OESSS requires Social Security cards for applicants and their children even though an applicant's AFDC identification card would contain the applicant's Social Security number.

by plaintiffs. For example, with respect to the case of Elizabeth M.G., Scott McNeilly testified that Elizabeth M.G. was improperly denied due to having income above the eligibility limit, and insisted that her income was in fact below the limit. No information on the applicant's income is contained in the file to either prove or disprove McNeilly's contentions. Pl.Exh. 111.

27. Plaintiffs presented an intake log (Pl.Exh. 156B) maintained by OESSS staff, which allegedly reveals instances where families were not given contingent placements despite notations in the OESSS case files stating that contingent placements were provided. In the two examples presented, the applicant had previously visited OESSS and the keeper of the log had written in one instance "information could not be verified", and "client has no documentation to verify homelessness" in another instance. Plaintiffs contend that the log demonstrates that in fact, the families were not initially given a contingent placement. However, without testimony concerning the keeping of the log and the purposes for which the log was kept, the Court simply cannot conclude that the log is evidence of improper actions on the part of OESSS.

28. As an illustration of the burdens imposed by the District's document requirements, plaintiffs presented information from an intake log (Pl. Exh. 156B) maintained by various OESSS staff. The logs reveal a number of applicants who visited the OESSS office on numerous occasions. However, the relevance of this evidence is minimal, at best, due to an absence of information concerning the reasons for the repeated trips. In the absence of testimony on this point, the Court does not find the mere fact that individuals made repeated visits to OESSS to be particularly probative of plaintiffs' claims.

29. New York City has a policy of unlimited shelter for all who request it, a very different system from the District's.

30. The precise percentage of applicants who are AFDC recipients was disputed by the parties. Scott McNeilly testified on behalf of plaintiffs that at least 75 percent of applicants were recipients of AFDC. Ms. Shaw testified that approximately 50 percent of applicants receive AFDC. In any case, the number of applicants applying for emergency family shelter who also receive AFDC is substantial.

In order to obtain AFDC, recipients provide verification to DHS of their Social Security number, their birth, the number of children in the family, the family relationship involved, and their income. Birth certificates are required to be in a family's AFDC file. Thus, plaintiffs contend that much of the information required by OESSS could be easily verified in a simple telephone conversation or facsimile transmittal between OESSS and other DHS staff.

In response to plaintiffs' criticisms, the District contends that due to short staffing, AFDC personnel are not always available to take a telephone call to verify information in a particular file. In addition, defendant correctly points out that a determination of eligibility for AFDC is not the same as a determination of eligibility for shelter; accordingly, the mere fact that someone receives AFDC does not automatically qualify them for shelter.

Another potential means of coordination highlighted by plaintiffs is the ACEDS computer system, utilized by DHS, which contains, *inter alia*, names of all family members and their relationships, Social Security numbers, income information, and information about public benefits being received. The system can be searched by name, alias, or Social Security number. Despite the fact that the information is available on ACEDS, OESSS requires independent proof of family status. In part, this is because OESSS does not presently have full access to ACEDS. Moreover, Ms. Shaw testified that OESSS has concerns about the accuracy of the information on the system, which has not been verified in all cases.

### b. Other Burdensome Aspects of the Documentation Requirements

### 1. Requirement that Children be Present at Intake

Plaintiffs' witnesses testified that OESSS requires all children to be present at the time

of initial application, which they contend imposes an undue hardship on homeless families and inappropriately keeps homeless children from school.[31] Particularly during the period of time in which applicants were required to reapply on a daily basis, the Court agrees that this requirement would be burdensome.

In response to plaintiffs' allegations, Ms. Shaw testified that OESSS did not require children to be present at the time of application, but rather, at the time the family was actually placed in housing. However, she conceded that the language on forms previously utilized by OESSS, stating that "All children must be present at the time of intake," could be confusing. The forms presently used by OESSS do not include any reference to children being present at the time of intake, and plaintiffs presented no evidence of this being official OESSS policy at this time.

### 2. Writs of Eviction

Plaintiffs assert that to the extent an applicant claims eviction as their reason for homelessness, OESSS requires proof that a writ has been actually executed by the U.S. Marshal. Plaintiffs presented cases in which families were denied emergency shelter when they presented a writ of eviction but had not yet been physically evicted. For example, Michelle D. was denied eligibility because she produced a writ of eviction but not a Marshal's notice of the date the eviction would take place. Pl.Exh. 107. Cynthia Blount was denied shelter in 1993 because she had only an eviction notice but had not yet been physically evicted.

Ms. Shaw testified that if an applicant's reason for homelessness was eviction, OESSS required documentation showing that an eviction had occurred or that a writ had been executed. If an applicant did not have such documentation, OESSS staff would

---

**31.** Remarkably, in their Proposed Findings of Fact, plaintiffs state "The intake log shows that many families were denied because the children were not all present for the application process." Proposed Finding of Fact 76, at 15. However, for each of the entries cited by plaintiffs as support for this statement, more than one reason for

"denial"—if such was really the case—is listed. For example, a number of entries state that the applicant had no documents *and* children were not present. This example graphically illustrates the difficulty the Court has in finding the log and the notations made therein as probative evidence of OESSS' actions.

check a daily list of evictions prepared by the Marshal's Service. If an applicant's name appeared on that list, that was considered sufficient evidence of the reason for homelessness. However, Ms. Shaw did not contradict plaintiffs' fundamental allegations concerning the writ requirement.

### 3. Birth Certificates

OESSS requires applicants to submit long-form birth certificates in order to verify the relationship between parents and children. If an applicant does not have birth certificates for each adult and child, the applicant must obtain the certificate from the Office of Vital Statistics within DHS. Obtaining a birth certificate is both a time consuming and expensive process, particularly if an applicant or the applicant's children were born out of state. According to the uncontroverted testimony of plaintiffs' witnesses, birth certificates cost $16.00 each in the District of Columbia, plainly a significant expense for a homeless family. Fee waivers are obtainable in some but not all cases.

Significantly, birth certificates are obtained from DHS, the same department that oversees OESSS. Moreover, AFDC recipients typically have submitted birth certificates as part of the AFDC application process, meaning that the birth certificates should appear in their AFDC file.

### 4. Social Security Cards

OESSS requires applicants to submit Social Security cards or a printout from a Social Security office to demonstrate their eligibility for emergency shelter. For applicants who do not have Social Security cards for themselves or their children, this requirement plainly requires a trip to a Social Security office and could entail a wait. As previously discussed, information on Social Security numbers is provided to DHS by AFDC recipients, and AFDC identification cards contain the recipient's Social Security number.

### 5. Civil Protection Orders

Plaintiffs contend that OESSS requires a civil protection order as proof of homeless-

ness in instances where applicants are homeless as a result of domestic violence. Witnesses testified that such a requirement places applicants in a potentially difficult and dangerous situation. Pamela Shaw contradicted plaintiff's allegations, stating that OESSS strongly recommends that victims of domestic violence obtain civil protection orders for their own protection, but that OESSS does not require such an order to establish eligibility for shelter.

### D. The Appeals Process

As previously stated, the regulations governing the emergency shelter program provide for administrative review and hearings upon request for applicants who are determined to be ineligible for shelter. The regulations require that a request for a fair hearing must be made within 10 days of receiving actual written notice of the denial. The regulations further state that the Office of Fair Hearings shall render a recommended decision within five days of the hearing, but the regulations do not contain time frames for administrative review, the actual hearing, or issuance of the final hearing decision.

The OESSS utilizes a "Notice of Eligibility Determination for Emergency Overnight Shelter" form to notify applicants of their eligibility (or ineligibility) for shelter. Pl. Exh. 175A. The form states that if an applicant is not satisfied with the decision, she may request an administrative review of her case within 24 hours of receipt of the notice. The form further states that the administrative review decision will be provided within 24 hours of the request for review.

Additionally, the Notice of Eligibility Determination states that applicants who are not satisfied with the decision of their administrative review may, within 10 days of the decision, request a fair hearing. The form states that "a hearing decision will be rendered within 2 business days of your request."

Plaintiffs established at trial that administrative reviews do not generally occur within 24 hours of a request, nor are decisions rendered within 24 hours thereafter.[32] Nor

---

32. Plaintiffs presented the cases of 9 applicants   who did not receive an administrative review

are decisions rendered within two days of a request for a fair hearing. The District concedes that the time frames stated on the Notice of Eligibility Determination are not followed, but contends that the time frames are simply erroneous.[33] The District maintains that there is no legal requirement that administrative reviews occur within 24 hours; rather, that time frame was an internal goal created by OESSS. Moreover, the District insists that applicants who request fair hearings receive such hearings.

As proof of plaintiffs' claim that the District lacks an effective appeal mechanism, Scott McNeilly, staff attorney for WLCH, testified that in his experience, he was never successful at obtaining a fair hearing on behalf of any of his clients, despite seven or eight requests for such hearings. McNeilly referred to a number of WLCH case files, summarized below.[34]

| APPLICANT | DATE OF REQUEST | OUTCOME |
|---|---|---|
| Jacqueline E. | 12/2/94 | Counsel lost contact with client (per 2/27/95 letter). |
| Sharon K. | 9/23/94 | Hearing scheduled for 2/2/95; outcome unclear |
| Vivian W. | 6/30/94 | No indication that hearing was ever scheduled |
| Troven M. | 12/5/94 | Resolved informally 12/18 |
| Elizabeth M.G. | 10/27/94 | Settled 12/20/94; hearing had been scheduled for 12/16/94 |

Plaintiffs also submitted a number of case files from the Office of Fair Hearings to illustrate the lack of an effective appeal mechanism for applicants for emergency shelter benefits. The following chart summarizes the cases presented[35]:

| APPLICANT | DATE OF REQUEST | OUTCOME |
|---|---|---|
| Howard & Vivian W. | 6/30/94 | On 7/20/94, Office of Fair Hearings determined that the request was premature because no eligibility determination had been made. |
| Jacqueline E. | 12/2/94 | 2/27/95 counsel for appellant informed Office of Fair Hearings that counsel had lost contact with client; no hearing held; note in file that Ms. Shaw would resolve the problem |
| Elizabeth G. | 10/27/94 | Informally resolved without a hearing on 12/18/94. |
| Troven M. | 11/15/94; formal request 12/5/94 | Informally resolved on 12/18/94 |
| Aurelia G. | 6/5/94 | Declared moot on 8/17/94 because the applicant had found housing; no hearing held, no decision. |
| Erica G. | 3/16/93 | Note in file that appeal withdrawn on 4/19/93; no hearing held, no decision. |
| Koya H. | 3/19/93 | No hearing held, no decision. |
| June H. | 4/29/93 | Notation in file that appeal withdrawn on 7/27/93; no hearing held, no decision rendered. |
| Robert J. | 6/4/93 | 7/7/93 case withdrawn because counsel lost contact with client |
| Alicia T. | 1/13/93 | 1/25/93 case withdrawn because counsel lost contact with client |
| Dionne T. | 2/5/93 | Hearing 2/16/93; determined that OESSS failed to consider mitigating circumstances; applicant permitted to reapply |
| Gregory Y. and Teresa C. | 1/25/93 | Hearing held 2/2/93; settled that day. |
| Tammy Montague | 3/93 | Considered withdrawn 4/26/93 when applicant found housing |
| Mary J-O | 1/13/93 | No hearing or decision |
| Sharon K. | 7/15/92 | Hearing scheduled for 8/4/92 but not held; no decision; outcome unclear from file |
| Gina D. | 12/18/92 | 12/30/92 counsel informed office that counsel lost contact with client; appeal dismissed on 2/3/93 |

decision within 2 business days of their request for a hearing. The time between the request and the decision in these cases ranged from 5 to 36 days.

33. Plaintiffs submitted a 1992 determination by the Chief Hearing Officer stating that the information on the Notice of Eligibility Determination was erroneous, yet OESSS continues to distribute the form containing information *known* to be incorrect. Notably, Holloway Wooten, the Chief Hearing Examiner for DHS, testified that he was not familiar with the two-day decision requirement on the Notice of Eligibility Determination.

34. Plaintiffs also introduced Pl.Exh. 196AB, a listing of emergency shelter cases before the Office of Fair Hearings. The listing includes both eligibility and expulsion cases, and no effort was made to distinguish between the two. Accordingly, the Court is unable to discern any information of value from the exhibit, and the information contained therein was not considered in connection with this case.

35. Four cases appear on both charts, but are presented nonetheless because the cases stem from two different sets of case files (WLCH and the Office of Fair Hearings) and contain, in some cases, different information.

| APPLICANT | DATE OF REQUEST | OUTCOME |
|---|---|---|
| Lenann B. | 7/23/92 | Notation in file that appellant did not show on 9/1; no indication that hearing was ever held or decision rendered |
| Edna P. | 8/5/92 | No hearing held; notation in file that case being reviewed by OESSS and appellant to remain in shelter in the interim |
| Latasha W. | 10/9/92 | Withdrawn 11/3/92 after informal resolution (she found shelter) |
| Johnnie H. | 3/30/92 | Hearing scheduled for 6/17/92; postponed because appellant found shelter. |
| Franzin Melton | 4/3/92 | No hearing held; no decision rendered |
| LaBarbara C. | 10/14/92 | Settled at pre-hearing on 10/16/92 |
| Mary B. | 10/8/92 | Resolved at hearing on 10/16/92. |

The above-listed examples portray an utterly dysfunctional system for appeals. Hearing decisions are literally never issued "within two days of [an applicant's] request." While some appeals were resolved informally and an occasional hearing was held, many other cases languished due to the delay between the request for an appeal and action on the appeal. Counsel frequently lost contact with their clients in the interim. Also disturbing is the fact that in numerous instances (*e.g.,* Vivian W., Koya H., Mary J–O, Franzin Melton), no hearings were scheduled at all.

Furthermore, the above-listed examples vividly underscore the importance of a functioning fair hearing system. The cases cited above make clear that when hearings actually take place, applicants typically get relief. *See, e.g.,* Dionne T., Gregory Y. and Teresa C., LaBarbara C., Mary B.

## II. CONCLUSIONS OF LAW

### A. DUE PROCESS

Plaintiffs contend that numerous aspects of the District's emergency family shelter program, such as its documentation requirements and shortcomings in the appeals process, deny applicants due process of law. ██ In order to establish a violation of due process, plaintiffs must first establish that they have a property interest in emergency shelter sufficient to trigger due process protections. Once plaintiffs establish a property interest, the inquiry turns to whether plaintiffs received the process they were due. *Reeve Aleutian Airways, Inc. v. United States,* 982 F.2d 594, 598 (D.C.Cir.1993).

### 1. Plaintiffs Have a Protected Property Interest

██ The Court has previously held that "plaintiffs have a property interest in overnight shelter sufficient to trigger due process protections." Mem.Op. and Order (Mar. 27, 1995) at 16. Further elaboration on the basis for and nature of plaintiffs' property interest is set forth below.

██ In *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the Supreme Court stated the basis for finding a property interest:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.... Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Applicable authority plainly supports the notion that *applicants* for benefits, and not just current recipients, may enjoy due process protections. *See Daniels v. Woodbury County,* 742 F.2d 1128, 1132 (8th Cir.1984) (applicants for general assistance); *Kelly v. Railroad Retirement Bd.,* 625 F.2d 486, 489 (3d Cir.1980) (applicant for disability annuity under the Railroad Retirement Act); *Davis v. Ball Memorial Hospital Ass'n,* 640 F.2d 30 (7th Cir.1980) (applicants for medical services under the Hill–Burton Act); *Flagstaff Medical Center, Inc. v. Sullivan,* 773 F.Supp. 1325, 1346–47 (D.Ariz.1991), *aff'd. in part and rev'd. in part on other grounds,* 962 F.2d 879 (9th Cir.1992) (same); *Karan v. Adams,* 807 F.Supp. 900, 910–11 (D.Conn.1992) (applicant for license to practice psychology).

Important to a finding of entitlement is whether the applicable statute and regulations restrict the exercise of official discretion:

> Whether a given statutory scheme gives rise to a protected interest depends on whether the authority promulgating the statute or regulation has placed substantive limits on official discretion, ... i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow.

*Tarpeh–Doe v. United States*, 904 F.2d 719, 722–23 (D.C.Cir.1990), *cert. denied*, 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). The test was presented by the Second Circuit as "whether, absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted." *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985); *see also Ressler v. Pierce*, 692 F.2d 1212 (9th Cir.1982). "[A]pplication of the test must focus primarily on the degree of discretion enjoyed by the [government], not the estimated probability that the [government] will act favorably in a particular case." *RRI Realty Corp. v. Southampton*, 870 F.2d 911, 918 (2d Cir.), *cert. denied*, 493 U.S. 893, 110 S.Ct. 240, 107 L.Ed.2d 191 (1989).

Here, the relevant statute directs that "[t]he Mayor *shall* provide emergency overnight shelter to an eligible homeless person ...", D.C.Code Ann. § 3–605(a), and the corresponding regulations state that the Department of Human Services "*shall* provide an applicant family determined eligible for temporary family housing a written referral to a designated temporary family housing facility." 29 DCMR Ch. 25 § 2503.12 (1992) (emphasis added). Moreover, it is the policy and practice of OESSS to provide emergency shelter to *all* eligible families at the time an eligibility determination is made.

The statute and regulations also place substantive limits on official discretion in determining who is eligible for benefits. As described in the Court's Findings of Fact, the statute and regulations define eligibility in terms of an applicant's financial situation and housing opportunities, and documentation of

same. D.C.Code Ann. § 3–603(5), 3–605(b); 29 DCMR Ch. 25 § 2502.3 (1992). Thus, the statute and regulations are clear that if the prerequisites are met—the applicant demonstrates a lack of available housing and financial resources—the applicant is eligible for shelter.

The District has consistently argued that plaintiffs cannot establish a property interest due to language in the governing statute and regulations stating that "[n]othing in [the law] shall be construed to create an entitlement in any homeless person or family to emergency shelter or support services." D.C.Code.Ann. § 3–206.9; *see also* 29 DCMR Ch. 25 § 2500.3 ("Eligibility for temporary housing for families ... does not entitle a homeless person to shelter and support services.") This language notwithstanding, the District of Columbia's designated corporate representative, Pamela Shaw, unequivocally testified that the District's policy and practice is to provide shelter to *all* families found eligible, and the record firmly supports her testimony.

The fact that not all applicants meeting the eligibility criteria ultimately receive shelter due to funding constraints affects the nature and contours of plaintiffs' property interest, as described more fully below, but in no way does it eliminate plaintiffs' right to due process in the consideration of their eligibility for shelter. *See Davis v. Ball Memorial Hospital Ass'n*, 640 F.2d 30 (7th Cir.1980) (applicants for assistance may establish a protected property interest even if all eligible persons do not ultimately receive benefits due to funding constraints). In light of the District's undisputed policy and practice of providing shelter to *all* families found eligible, the "entitlement" language in the statute and regulations is more a statement of fiscal reality than a statement of legal entitlement.

### 2. *What Process is Due*

Having determined that plaintiffs have a protected property interest, the question turns to whether plaintiffs have received the process they are due. Due process is a "flexible" concept, and "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S.

471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). In evaluating plaintiffs' claims, the Court balances the private interest affected, the risk of erroneous deprivation of that interest under the present system and the likely value of additional safeguards, and the government's interest. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). At bottom, the due process clause guarantees "an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333, 96 S.Ct. at 902.

Plaintiffs point to several areas in which they contend the District of Columbia deprives plaintiffs due process:

♦ Unduly burdensome documentation requirements;

♦ Lack of coordination between OESSS and other offices within DHS;

♦ Lack of a policy manual and worker training to ensure proper and consistent eligibility determinations;

♦ Lack of eligibility determinations at the time application is made;

♦ Lack of an effective appeals mechanism. Plaintiffs contend that these shortcomings create a substantial risk of erroneous eligibility determinations, and that improved measures can be instituted at little or no expense to defendant. An evaluation of plaintiffs' claims in light of the three factor balancing test set forth in *Mathews v. Eldridge* follows.

**a. Private Interest at Stake**

■ The private interest at stake is this case is shelter for homeless families, one of the most fundamental human needs imaginable. The fact that the affected population approaches the emergency shelter system in an extremely vulnerable state—literally faced with the question of "where is my family going to sleep tonight?"—requires the Court to evaluate the District's requirements with particular sensitivity to the applicants' difficult circumstances. *Gray Panthers v. Schweiker,* 652 F.2d 146, 166 (D.C.Cir.1980).

The homeless families' interest is tempered somewhat, however, by the fact that not all applicants who meet the eligibility criteria actually receive shelter, due to funding constraints. Thus, the families' interest is strong but not dispositive.

**b. Risk of Erroneous Deprivation, Benefit of Additional Safeguards, and Government Interest at Stake**

The Court must also evaluate whether the District's policies and procedures concerning eligibility determinations present a significant risk that applicants will erroneously be deprived of shelter, and whether additional safeguards would reduce the risk of erroneous deprivation. This factor, along with the private interest at stake, is balanced against the government's interest in the procedures in question. The analysis is set forth separately for each of plaintiffs' major criticisms of the OESSS program.

**1. Documentation Requirements**

In evaluating the District's documentation requirements, the Court is mindful of the acutely vulnerable state of the homeless families who embark upon the emergency shelter application process. Outside observers coolly analyzing the system might find clarity and reason where those in a more desperate, chaotic position would not. Accordingly, it is imperative that the process and eligibility requirements be presented in as simple, clear, and accurate terms as possible.

Analysis of the risk of erroneous deprivation caused by the District's documentation requirements is complicated by the fact that the District's policies and procedures have changed substantially over the years.[36] In evaluating the documentation requirements and their conformity to due process, the Court has determined that it is appropriate to limit the focus to experience under the present waiting list system, which has been in effect since January 1994. Experience under the previous systems, while interesting historically, is of limited probative value in evaluating the current system, which, under mootness doctrine, must be the focus of the inquiry.

Under the District's current policy and practice, applicants are plainly given notice,

---

**36.** *See, e.g.,* the Court's discussion of denials for

failure to assist in the verification process, *supra.*

via the Document Checklist, of the documentation required to establish eligibility for the program. As previously described, families are required to provide (1) Social Security cards for all adults and children; (2) long form birth certificates for all adults and children; (3) picture identification; (4) proof of income; and (5) proof of homelessness, in the form of a statement from a family member, former landlord, or property manager stating that the family can no longer live there, an executed writ of eviction, or a civil protection order.

Unquestionably the District is entitled to verify a family's eligibility for shelter, through documentation or otherwise. The applicable statute and regulations clearly permit—indeed, require—such verification, and it would be irresponsible for the District to do otherwise. The real question presented in this case is whether the District's documentation requirements are so burdensome and so inflexible, considering the population in question, such that they create a real risk that otherwise eligible families will be denied shelter.

■ The Court is persuaded that two aspects of the documentation requirements are sufficiently burdensome and unjustifiable to create a risk that eligible applicants will be denied shelter or discouraged from pursuing the process altogether. First, the District's failure to define "reasonably available" documentation, and its corresponding lack of a formal policy for addressing situations where documents are not readily obtainable by applicants, present a serious risk of erroneous deprivation. The evidence at trial supported the District's position that families whose waiting list numbers are called but who lack all the requisite documentation are placed in shelter contingent upon providing verification. However, the contingent placement policy is not contained on the forms or explained to applicants. Consequently, there is a real risk that applicants mistakenly believe that if they do not provide *all* documents

within seven days, they will be denied shelter. As a result, there is a significant risk of otherwise eligible applicants abandoning their quest for shelter because of obstacles to obtaining the requisite documents.[37]

Similarly, while the District has legitimate reasons for requiring proof of identity, income, family relationship, and lack of shelter, it is critical that the District have policies for addressing the inevitable situation of applicants who, for one reason or another, are not in a position to obtain the relevant documentation. After all, the applicants in question are homeless. Given their unstable situation, they may well not have the luxury of ready access to complete family records, or an address to which missing documentation could be sent. Accordingly, the District must develop and implement policies which allow flexibility in the documentation requirements in appropriate circumstances, but which still enable the District to satisfy itself of an applicant's eligibility. The policies must be communicated clearly and accurately on the application forms and Document Checklist.

■ Second, the District's failure to coordinate with other offices within DHS concerning information required by OESSS but already on file elsewhere in DHS imposes an unreasonable burden upon homeless family applicants and creates a substantial risk that eligible applicants will be erroneously deprived shelter. Given the population involved in this case—homeless parents and their children—it is critically important that the District streamline its requirements to eliminate unnecessary burdens on shelter applicants. For shelter applicants who present proof, via an identification card or otherwise, that they are AFDC recipients, OESSS must avail itself of information the District already has—e.g., in the AFDC case file or through ACEDS—rather than requiring the applicant to obtain duplicative documentation.

The benefits of such coordination are manifest, and the burdens on the District would

**37.** In this regard, the District must also clarify the information on its forms stating that documents must be submitted within seven days. The modified language should conform with the District's policy that while documents should be submitted as soon as possible to facilitate swift eligibility determinations, the applicant's place on the waiting list is secure regardless of whether the documents are submitted within seven days, at the time of placement, or soon thereafter.

be minimal.[38]   At bottom, what is involved is the simple act of a telephone call or facsimile transmission between offices to verify information.   Given the simplicity of the task, especially when compared to the paramount importance and benefit to homeless family applicants, it is both perplexing and distressing that such coordination has not yet been implemented.   Accordingly, the District shall develop and implement policies to achieve coordination of information concerning eligibility verification between OESSS and other appropriate DHS offices.

Other aspects of the District's documentation requirements challenged by plaintiffs do not offend due process.   For example, plaintiffs contend that the District's requirement that all children be present at the time of initial application imposed an undue hardship upon families.   However, there is no evidence that this is the District's current practice; accordingly, plaintiffs' claims in this regard are moot.

▉▉▉   Another of plaintiffs' criticism concerns the District's requirement that applicants provide proof of actual execution of a writ of eviction if their reason for homelessness is the writ.   However, because the purpose of the program is to provide emergency shelter to families who are homeless, the Court does not find it unreasonable that the District requires actual execution of a writ as proof of homelessness.   Prior to actual execution of the writ, circumstances may change that result in the writ being vacated.   Plaintiffs' claims on this point are not persuasive.

Plaintiffs contend that OESSS requires applicants whose reason for homelessness is domestic violence to obtain a civil protection order, at great personal risk, as proof of homelessness.   The evidence on this point is equivocal, and fails to demonstrate that OESSS actually *requires*, rather than recommends, that applicants obtain such an order.   In any event, the Court expects that the situation faced by victims of domestic violence, and the obstacles to documentation for those in that situation, will be addressed by

the District in its policies concerning the meaning of "reasonably available" documentation.

Finally, plaintiffs criticize the District's failure to consider mitigating circumstances at the time of application, which could spare an applicant who received shelter during the previous 12 months from disqualification.   Plaintiffs' evidence on this claim is insufficiently compelling to demonstrate a denial of due process.   Plainly, a failure to consider mitigating circumstances is a matter which unsuccessful applicants could raise in a fair hearing on appeal.   But the evidence presented in this case concerning the failure to consider mitigating circumstances at the outset does not rise to the level of a systemic violation of due process.

### 2.   *Policy Manual/Worker Training*

▉▉▉   With regard to plaintiffs' allegations concerning the lack of a policy manual and system of worker training, plaintiffs have not demonstrated, particularly under the present waiting list system, that the absence of a manual or comprehensive system of worker training has resulted in a persistent problem of erroneous deprivation of shelter benefits.   While plaintiffs did present evidence of a few situations in which applicants were erroneously denied eligibility, it is well settled that occasional errors by individual employees do not establish a violation of due process.   *Carter v. District of Columbia,* 795 F.2d 116 (D.C.Cir.1986).   Rather, plaintiffs must show a "policy or custom" of erroneous deprivation.   *Id.* at 122.   This they have not done.

Furthermore, while theoretically a policy manual and additional worker training might well be useful in documenting procedures and ensuring compliance with the procedures, the evidence established that OESSS workers have considerable guidance in making eligibility determinations.   First, the statute and regulations governing the program are quite detailed in describing the eligibility requirements for shelter.   Second,

38.   At trial, the District argued that coordination with DHS staff responsible for AFDC would be difficult due to short staffing in the AFDC offices. While staffing considerations might mean that

OESSS staff might not be able to obtain *immediate* information from AFDC workers, it does not mean that coordination is impossible.

Pamela Shaw presented unrebutted testimony that all OESSS employees are provided ongoing training, in addition to an intensive initial orientation period. Finally, the documents provided to homeless family applicants provide considerable information concerning the procedures OESSS follows in determining eligibility and allocating shelter. Thus, particularly in light of the lack of evidence concerning a policy or practice of erroneous determinations, plaintiffs cannot prevail on their policy manual and worker training claims.

### 3. *Fair Hearings*

■■■ In the Court's view, the most egregious violation of due process in the existing system stems from the District's utter failure to provide timely hearings and decisions to applicants who believe they were wrongly denied eligibility. The problem starts with the fact that the District's notice concerning appeals is erroneous, advising appellants of an incorrect time frame within which decisions will be rendered. That problem is compounded by the fact that many applicants receive either no hearing or a greatly delayed hearing on appeal. In the meantime, contact with the applicant is frequently lost. Not only are applicants denied "the opportunity to be heard at a meaningful time and in a meaningful manner" concerning their eligibility for shelter, but the present system vividly illustrates the adage "justice delayed is justice denied."

It is imperative that the District develop policies and procedures to assure that hearings take place within a reasonable time of a request and that decisions are rendered promptly thereafter. The Court will not at this juncture dictate a particular time frame within which hearings must be held and decisions rendered. Rather, the District must establish a specific time frame for hearings and decisions, taking into account the critically important benefits in question.[39] In addition, the time frames must be clearly and accurately communicated to applicants on the Notice of Eligibility Determination.

■■■ Plaintiffs contend that applicants should be given shelter pending an appeal, arguing that the vital nature of the benefits in question requires such a result. The Court disagrees. This is not a case of current recipients of benefits seeking continuation of benefits during termination proceedings. Rather, this case concerns applicants for benefits to which they are only entitled at the point in time they are determined eligible. Moreover, there are two points in time that an applicant could receive a negative Eligibility Determination: (1) at the time of initial application, and (2) at the time the applicant's waiting list number is called. With respect to those applicants who are denied at the point of initial application, it would be patently unfair to place those applicants in shelter prior to applicants whose waiting list numbers were actually called. In sum, shelter during the pendency of a quickly determined appeal is not justified here.

### 4. *Lack of Eligibility Determination at Time of Application*

■■■ The District's failure to provide eligibility determinations at the time of a family's initial application is criticized by plaintiffs as a violation of due process.[40] Granted, there is a considerable delay between a family's initial application and its eligibility determination, which does not generally take place until the time the family's waiting list number is called. The District has elected to link the eligibility determination with identification of available shelter for a particular applicant. After careful evaluation of the matter,

---

**39.** The Court observes that the District apparently believed two days was a suitable and workable time frame for a hearing and decision, given that the District included this time frame on its Notice of Eligibility Determination. Such a time frame, if followed, would comport with due process.

Moreover, while the Court will not micromanage the details of the District's fair hearing process, it would appear, given the need for swift action, that certain measures, such as a court reporter and transcribed hearings, might be dispensed with in favor of quicker and more economical means, such as taped proceedings, which are customarily used, even in criminal proceedings, before the Magistrate Judges of this Court.

**40.** Plaintiffs also contend this practice violates the Equal Protection clause, as discussed below.

the Court accepts the District's rationale for delaying eligibility determinations until that time.[41]

Plaintiffs argue that applicants would benefit from earlier determinations, contending that even though shelter might not be provided until a later date, other benefits offered by the program to eligible families would be available. The Court is not persuaded that the modest nature of these benefits outweighs the District's interest in delaying eligibility determinations.

The benefits identified by plaintiffs include referrals to other social services, referral to Healthcare for the Homeless, priority on the DPAH waiting list, and case management services. While certainly useful to eligible families, these services certainly do not compare to the primary benefit of the program, which is shelter. Thus, when the nature of the benefits in question is balanced against the District's interest in the present system, the Court is persuaded that deferral of eligibility determinations until the time of possible placement does not deny applicants due process.[42]

## B. *EQUAL PROTECTION*

■■■■ Plaintiffs contend that the present system of allocating shelter violates equal protection because it irrationally discriminates between eligible families, some of whom receive eligibility determinations and

shelter, and some of whom do not. To pass constitutional muster under the Equal Protection clause, the District must demonstrate that the classification in question is rationally related to a legitimate governmental interest. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Stated differently, classifications which irrationally discriminate between similarly situated individuals violate Equal Protection. "Imperfect" classifications do not violate the Equal Protection Clause. *Id.* at 485, 90 S.Ct. at 1161. Moreover, "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *Id.* At the same time, "[a]lthough states may have great discretion in the area of social welfare, they do not have unbridled discretion. They must still explain why they chose to favor one group of recipients over another." *Ranschburg v. Toan,* 709 F.2d 1207, 1211 (8th Cir.1983).

■■■ Upon consideration of the evidence produced at trial, the Court is persuaded that the District's system for allocating emergency family shelter satisfies the Equal Protection Clause. All families, except those with obvious eligibility problems, are placed on a waiting list for shelter. Their waiting list numbers are called in order, given family size and other appropriate considerations. Shelter is provided to eligible applicants whose waiting list numbers are called.[43]

---

**41.** As the application packet itself states, "eligibility is point-in-time sensitive ... [accordingly,] a formal eligibility determination prior to the day of potential placement is of no value." Pl.Exh. 175 at 2 ¶ 9.

**42.** With regard to the particular benefits in question, the Court earlier noted that case management services are not provided by OESSS, but rather by individual shelters. Moreover, the evidence adduced at trial suggests that priority on the DPAH waiting list is given to all homeless families, not just those in emergency shelter. Finally, with regard to referrals to Healthcare for the Homeless, the evidence at trial indicated that the clinic's facilities and staffing are very modest, permitting the staff to provide primarily screening and referrals to other healthcare providers. Applicants who receive AFDC would obtain more comprehensive medical care through Medicaid. Other eligible families might find the clinic's services of benefit, but in the Court's view, that benefit does not outweigh the District's interest.

**43.** In this regard, the Court is struck by the fact that plaintiffs have criticized all of the District's systems for allocating shelter, including the waiting list system, which leads the Court to wonder how plaintiffs would design a system to allocate shelter that is less than shelter on demand. Plaintiffs' expert, Dr. Rafferty, testified that the waiting list system imposes an undue hardship on homeless families. That same expert, however, testified that deciding how to allocate benefits among competing families would be like playing God, and she would not want to make that determination. She further admitted that a waiting list system would be one way to allocate the benefits.

While the waiting list system is not perfect, and while improvements could readily be made at little effort or expense (*e.g.,* including on the tape recording those waiting list numbers previously called but not yet claimed), the Court believes the waiting list system is a fair way of allocating scarce benefits among an overabundance of eligible families in need.

Eligibility is not determined until the point in time that a potential shelter space becomes available for an applicant because eligibility is a time sensitive inquiry. An applicant's circumstances can change in the time between the initial application and the final eligibility determination.[44] Thus, the District's policy of delaying an eligibility determination is entirely rational, and unquestionably satisfies the requirements of the Equal Protection Clause.[45]

▆▆▆ Similarly, the District has a rational basis for discriminating between eligible families who receive shelter and eligible families who do not—namely, the District lacks the funding to provide shelter to all eligible families. Plaintiffs contend that the District's funding constraints are due in large part to the District's own actions. Consequently, they argue the District should not be permitted to justify its lack of shelter on this basis. Plaintiffs argument is unpersuasive.

Specifically, plaintiffs contend that the District lacks funding for emergency shelter because of mismanagement of its public housing program and its withdrawal from the federal reimbursement program for emergency family shelter. The Court certainly finds the District's withdrawal from the federal reimbursement program to be irresponsible and short-sighted. It is difficult to fathom why the District would elect to forego federal aid which would enable the District to assist additional homeless families in need. Moreover, at least until the City Council changed the law to make the District's participation discretionary, the District's withdrawal from the federal program violated District law.

Still, however appalled the Court might be by the District's actions in this regard, it is not the province of the Court to second-guess the decisions of city leaders concerning the District's participation, or lack thereof, in a federal program. As the Supreme Court aptly stated in *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491 (1970):

> the intractable economic, social, and even philosophical problems presented by public welfare assistance .programs are not the business of this Court ... [T]he Constitution does not empower this Court to second-guess state officials ....

Thus, regardless of the Court's personal views on the matter, the Court certainly is not prepared to say that the District's decision violated the Equal Protection clause.

With regard to the District's alleged mismanagement of public housing, while conceivably better management would help move families from emergency shelter into permanent shelter and open up space in emergency shelter as a result, these allegations are simply too abstract to be considered in connection with this litigation. Moreover, this case is not about the public housing program. The claims in the case relate wholly to the emergency shelter program. No allegations in the complaint concern the public housing program; nor were the relevant officials of the public housing program named as defendants or otherwise involved in this case. Accordingly, the Court rejects plaintiffs' Equal Protection contentions relating to mismanagement of the public housing program and its possible effect on the emergency shelter program.

### III. *CONCLUSION*

Stepping back and reviewing both the allegations and the evidence in this case, it is evident that many of plaintiffs' criticisms stem from the failure of the District's emergency shelter program to measure up to plaintiffs' expectations. Plaintiffs seek an emergency shelter system that essentially provides shelter on demand to those who

---

44. The deposition testimony of Junetta Hill illustrates this point. Ms. Hill's waiting list number was called, but because she had an additional child in her family as compared to the time of her initial application, the accommodations OESSS had identified were no longer of suitable size for her family.

45. The fact that other eligible applicants do not receive referrals to Healthcare for the Homeless and other benefits as a result of the current system does not make the District's system irrational. As explained in greater detail in the discussion of due process, the Court views these benefits as fringe benefits as compared to the fundamental purpose of the program, namely shelter.

need it. Toward that end, documentation requirements should be kept to a minimum, and all efforts should be directed toward swift placement of families in need.

The Court shares plaintiffs' vision as an ideal; presumably so do District officials. But that is not the system at issue in this case. As plaintiffs themselves aptly stated in their post-trial memorandum, presently "there is no *emergency* shelter available to homeless families in the District," at least insofar as government-provided shelter is concerned. Memo. at 1. Rather, the District operates a program which provides temporary shelter to a limited number of families in need. Documentation of eligibility is more akin to other social service programs than a truly "emergency" shelter system.

The Court's task in this case has been to evaluate the present system, not to see whether it measures up to plaintiffs' ideal, but rather to see whether it measures up to the Constitution. The waiting list system, in general, is a fair way of dealing with a difficult situation. It is a rational way of allocating scarce resources to an overabundance of families in need. However, due process demands that the District modify its documentation requirements and improve its system for appeals to ensure that homeless family applicants receive all the process to which they are entitled under the Constitution of the United States.

In light of the foregoing Findings of Fact and Conclusions of Law, it is hereby

ORDERED that within 60 days of this Memorandum Opinion and Order, the District shall develop and implement policies and procedures to define "reasonably available" documentation in view of the circumstances faced by homeless family applicants, and to provide for relief from certain documentation requirements for applicants for whom the documents are not "reasonably available." The policies and procedures shall be clearly and accurately described in the application packet and the Document Checklist; it is

FURTHER ORDERED that within 60 days of this Memorandum Opinion and Order, the District shall develop and implement policies and procedures to require coordination between OESSS and other appropriate offices within DHS for the purpose of verifying information contained within DHS (*e.g.,* Social Security cards, birth certificates, income information) for shelter applicants who are AFDC recipients; it is

FURTHER ORDERED that within 60 days of this Memorandum Opinion and Order, the District shall develop and implement policies and procedures to provide prompt hearings and prompt decisions on appeals from adverse eligibility determinations, and to include accurate information on the Notice of Eligibility Determination regarding the time frames for hearings and decisions; and it is

FURTHER ORDERED that plaintiffs shall submit their request for attorneys' fees on or before April 8, 1996. Defendant's opposition shall be filed on or before April 29, 1996; plaintiffs' reply, if any, shall be filed on or before May 13, 1996.

Judgment shall be entered in accordance with this Memorandum Opinion and Order on a separate Judgment issued this date.

IT IS SO ORDERED.

### JUDGMENT

Judgment is hereby granted in favor of plaintiffs in part, against plaintiffs in part, in favor of defendant in part, and against defendant in part, in accordance with the accompanying Memorandum Opinion and Order and the Court's Memorandum Opinion and Order of March 27, 1995.

IT IS SO ORDERED.