Opinion for the Court filed by Circuit Judge TATEL.
Opinion dissenting in part filed by Circuit Judge WALD.
TATEL, Circuit Judge:
The central question in this case is whether District of Columbia law creates a constitutionally protected entitlement to emergency family shelter. Although D.C. law establishes objective eligibility criteria for homeless families seeking shelter, for a combination of reasons we hold that homeless families lack an expectation of shelter sufficient to create a property right: the city does not provide enough shelter to meet the needs of all eligible families, it leaves allocation of limited shelter space among eligible families to the unfettered discretion of city administrators, and nothing in District law prohibits administrators from allocating space in such a way that not all eligible families receive shelter. Indeed, the city administered the family shelter program just that way at the time this suit was filed. We thus reverse the district court’s due process ruling. We agree with the district court, however, that the city’s policy allowing certain advocates for the homeless to visit the Shelter Office waiting room only on Wednesday mornings and Tuesday and Friday afternoons violates the First Amendment.
I
In 1984, District of Columbia voters approved an initiative known as the District of Columbia Right to Overnight Shelter Act, guaranteeing to “all persons in the District ... the right to adequate overnight shelter.” D.C.Code Ann. § 3-601 (1988 Repl.). Three years later, the City Council enacted the Emergency Shelter Services for Families Reform Amendment Act, authorizing creation of a temporary shelter program for eligible homeless families. Id. § 3-206.3 (1988 Repl.) Known as the Family Shelter Act, it required the Mayor to “claim federal financial participation to the extent allowable by law for housing assistance and services to homeless families with minor children.” Id. § 3-206.3(a).
After several lawsuits against the city for failing properly to administer its emergency shelter programs produced huge contempt fines, see Atchison v. District of Columbia, 586 A.2d 150, 151 (D.C.1991), the City Council, citing an “explosion” in costs associated with shelter programs, moved to “limit specifically and define clearly the obligation of the District of Columbia” under the Overnight Shelter and Family Shelter Acts. Council of the District of Columbia, Comm. Report on Bill 8-156, at 2,14 (May 10,1990). To accomplish this goal, the City Council amended both Acts to provide that nothing in either “shall be construed to create an entitlement in any homeless person or family to overnight shelter.” District of Columbia Emergency Overnight Shelter Amendment Act of 1990, D.C. Law 8-197, 37 DCR 4815 (1990) (codified as D.C.Code Ann. § 3-206.9(a) (1994 Repl.); D.C.Code Ann. § 3-609 (1994 Repl.)).
Under the District’s family shelter program, families are eligible for shelter if they are homeless; if they can pay for shelter or, if not, if they receive vocational training or perform community service in exchange for shelter; and if they have not occupied emergency family shelter within the previous twelve months. D.C.Code Ann. § 3-601 (1994 Repl.). Section 3-605 of the Overnight Shelter Act and District of Columbia Department of Human Services implementing regulations establish additional eligibility criteria for families seeking shelter, including that applicants must be current on city taxes, must not have been evicted or expelled from temporary family housing or emergency shelter for drug-related reasons, and must not have been evicted from public housing for failing to accept employment or training or for nonpayment of rent. Id. § 3 — 605(b); D.C. Mun. Regs. tit. 29, § 2502 (1992). Shelter applicants must “provide any information *-1542 requested by the intake worker that is necessary to establish” their eligibility for emergency shelter, unless the information is not “reasonably available.” D.C. Mun. Regs. tit. 29, § 2503. Requested information may include eviction or foreclosure notices, income statements, social security numbers for each family member seeking shelter, and a statement of the reasons the family needs shelter, itself encompassing eighteen subcategories of information. Id.
Until May 1995, the city operated its emergency family shelter program through DHS’s Office of Emergency Shelter and Support Services. Although the District has since transferred the family shelter program to the Community Partnership for the Prevention of Homelessness, DHS retains authority over the program. Throughout this opinion, we refer to the office administering the shelter program as the “Shelter Office.”
Because the city lacks space to accommodate all families seeking shelter, and because neither the Overnight Shelter Act nor its implementing regulations direct the Shelter Office how to allocate available shelter, the Office has developed its own system for allocating shelter space among eligible families. Under current procedures, when a homeless family first applies for shelter, the Shelter Office screens the family to determine preliminarily whether the family meets the three basic statutory eligibility requirements. If no eligibility problems appear, the family is placed on a waiting list, assigned a number, and given a “document checklist” identifying the documents needed to verify eligibility. The family is instructed to call the Shelter Office each day to learn whether its number has been reached. Wait-list numbers are usually reached one to two months after families file their initial applications for “emergency” shelter. During this waiting period, about half of the applicant families drop out of the process. When a family’s wait-list number is reached, the Shelter Office reviews any additional documentation supplied by the family and makes a final eligibility determination. Families declared eligible then receive shelter.
Homeless families ruled ineligible for emergency shelter may obtain administrative review within the Shelter Office, D.C. Mun. Regs. tit. 29, § 2512.1, or a hearing before the District’s Office of Fair Hearings. D.C.Code Ann.§ 3-606(a), (c) (1994 Repl.); D.C. Mun. Regs. tit. 29, § 2511.5. Almost all families appealing adverse eligibility determinations are represented by counsel, and the great majority of cases appealed to the Office of Fair Hearings are resolved informally and quickly. Trial Tr. Vol. IV (May 25, 1995) at 564-65. Unsuccessful applicants may appeal to the District of Columbia Court of Appeals. D.C. Mun. Regs. tit. 29, § 2513.1.
The Washington Legal Clinic for the Homeless, a nonprofit organization providing services to the District’s homeless population, assists families in the shelter application process. Joined by staff members, a privately run shelter, and several homeless mothers, the Clinic filed this suit in 1993, alleging that the city was violating federal and D.C. law and the Fifth Amendment’s due process and equal protection guarantees by imposing upon applicants unnecessary and burdensome documentation requirements and by failing to afford disappointed applicants timely hearings.
Relying on the First Amendment, the complaint also challenged District policy limiting Clinic staff access to the Shelter Office waiting room. Although the policy allows advocates having pre-existing relationships with shelter applicants to be in the waiting room whenever open, the policy limits advocates without clients, i.e., “unsolicited advocates,” to one at a time and only on Wednesday mornings and Tuesday and Friday afternoons. Letter from Jesse P. Goode, Senior Attorney, District of Columbia Department of Human Services, to Katherine D. Mc-Manus, Howrey & Simon 1-2 (Mar. 18,1993).
Shortly after the suit was filed, the district court scheduled a hearing on plaintiffs’ request for a preliminary injunction to halt alleged violations of a federal' emergency assistance program in which the District participated. See Compl. at 43 — 14. On the eve of the hearing, the city withdrew from the program. When the district court then denied preliminary injunctive relief as moot, Washington Legal Clinic for the Homeless, Inc. v. Kelly, Civ. No. 93-0691, slip op. at 9 (D.D.C. *-1541 July 30, 1993), plaintiffs amended their complaint, adding a request for a declaratory judgment that by opting out of federal assistance for the family shelter program, the District had violated D.C.Code Ann. § 3-206.3(a), which requires the Mayor to seek federal financial assistance for housing and supplemental services to homeless families. See supra p. 3.
Over the next three years, the district court rendered the decisions at issue in this appeal. First, declaring the Shelter Office waiting room a nonpublic forum and finding that the city had offered no reasonable grounds for restricting access to the waiting room to only three periods per week, the court ruled that this portion of the District’s access policy violated the First Amendment. Washington Legal Clinic for the Homeless, Inc. v. Barry, Civ. No. 93-0691, slip op. at 20, 23 (D.D.C. Mar. 27, 1995) (“WLCH F). However, concluding that the District “reasonably determined that it cannot accommodate innumerable additional individuals in [the Shelter Office waiting room],” the court sustained the limit to one unsolicited advocate at a time. Id. at 22.
Next, the district court ruled that by opting out of federal funding for the city’s emergency shelter services, the Mayor had violated D.C.Code Ann. § 3-206.3(a). Washington Legal Clinic for the Homeless, Inc. v. Barry, Civ. No. 93-0691 (D.D.C. Apr. 12, 1995) (“WLCH IF). The court reached this result even though, again acting through emergency legislation, the District amended section 3-206.3(a) and related code provisions to make the city’s participation in federal emergency assistance programs discretionary, rather than mandatory. Id. at 1-2. “The fact remains,” the district court concluded, “that from July 1, 1993 [when the city opted out of the federal program] until April 11, 1995 [when the city changed the statute], defendant was in violation of § 3-206.3(a) of the District of Columbia Code.” Id. at 2.
Third, the district court ruled that plaintiffs had a constitutionally protected right to emergency shelter. WLCH I at 16-17. Following a bench trial, the court held that two aspects of the District’s documentation requirements — the city’s failure to define “reasonably available” documentation and to coordinate with other DHS offices to assemble documentation — violated plaintiffs’ due process rights. Washington Legal Clinic for the Homeless, Inc. v. Barry, 918 F.Supp. 440, 457 (D.D.C.1996) (“WLCH IIF). The court also ordered the city to develop swifter appeal procedures. Id. at 459. Finally, finding no discrimination in the wait-list system for allocating emergency shelter, the court entered judgment for the District on plaintiffs’ equal protection claim. Id. at 461.
Only the city,, challenging the district court’s due process and First Amendment rulings, has appealed. Because the district court’s rulings are either conclusions reached on summary judgment or conclusions of law following trial, our review is de novo. SEC v. Life Partners, Inc., 87 F.3d 536, 541 (D.C.Cir.1996) (questions of law reviewed de novo), Tao v. Freeh, 27 F.3d 635, 638 (D.C.Cir.1994) (de novo review on summary judgment).
II
Before addressing the district court’s due process ruling, we emphasize what is at stake in this case and what is not. The quantity of emergency shelter available to homeless families is not at issue. The District does not attempt to supply shelter to all eligible families, nor does the Clinic seek the creation of additional shelter space. Because the city’s emergency family shelters operate at capacity, a fact counsel for the District confirmed at oral argument, this case is not about available beds going empty while homeless families pursue Kafkaesque application procedures. Nor is this case about discrimination in the shelter allocation process; the district court found that the city’s current procedures satisfy the Fifth Amendment’s equal protection guarantee, a decision the Clinic does not appeal. The sole question before us is whether D.C. laws and regulations governing the city’s emergency family shelter program create a constitutionally protected property interest in shelter, which in turn would require that the District’s allocation and appeal procedures satisfy due process standards.
*-1540 We begin with familiar principles. The Fifth Amendment’s Due Process Clause prohibits the District of Columbia from depriving persons of “property, without due process of law.” U.S. Const, amend. V. Individuals are entitled to due process, however, only if they have a constitutionally protected property interest. Brock v. Roadway Express, Inc., 481 U.S. 252, 260, 107 S.Ct. 1740, 1746-47, 95 L.Ed.2d 239 (1987); Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). To have a property interest in a government benefit, “a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.” Roth, 408 U.S. at 577, 92 S.Ct. at 2709. Entitlements derive from “an independent source such as state law,” i.e., statutes or regulations “that secure certain benefits and that support claims of entitlement to those benefits.” Id.
To determine whether a particular statute creates a constitutionally protected property interest, we ask whether the statute or implementing regulations place “substantive limitations on official discretion.” Olim v. Wakinekona, 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983); Tarpeh-Doe v. United States, 904 F.2d 719, 722 (D.C.Cir.1990). Statutes or regulations limit official discretion if they contain “ ‘explicitly mandatory language,’ i.e., specific directives to the decisionmaker that if the regulations’ substantive predicates are present, a particular outcome must follow.” Kentucky Dep’t of Corrections v. Thompson, 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989) (quoting Hewitt v. Helms, 459 U.S. 460, 471-72, 103 S.Ct. 864, 871-72, 74 L.Ed.2d 675 (1983)). In Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017-18, 25 L.Ed.2d 287 (1970), for example, the Supreme Court held that because persons meeting state AFDC eligibility standards automatically qualified for benefits, eligible individuals had a protected property interest in the receipt of the benefits. Where, however, the legislature leaves final determination of which eligible individuals receive benefits to the “unfettered discretion” of administrators, no constitutionally protected property interest exists. Roth, 408 U.S. at 567, 92 S.Ct. at 2704; see Eidson v. Pierce, 745 F.2d 453, 462 (7th Cir.1984) (where landlord participating in federal housing subsidy program has discretion to judge whether an eligible applicant is “otherwise acceptable,” no property interest in housing subsidy).
Applying these principles, we ask whether homeless families meeting the statutory qualifications for shelter are entitled to receive it. If so, as in Goldberg, eligible families would have a constitutionally protected property interest in shelter. 397 U.S. at 262, 90 S.Ct. at 1017-18. But if not entitled to shelter because administrators have discretion to choose among otherwise eligible families, they would have no constitutionally protected interest. See Eidson, 745 F.2d at 464.
As the Clinic observes, the eligibility standards set forth in the Overnight Shelter Act and its regulations are “fact based, objective criteria .... [which] do not involve intangible assessments or discretionary factors.” Ap-pellees’ Br. at 20. If all families meeting these criteria received shelter, we would agree with the district court and our dissenting colleague that applicants have a constitutionally protected entitlement to shelter. But that is not this case.
All parties agree and the City Council has recognized that the District has insufficient resources to provide shelter for all eligible families. Indeed, the supply of emergency shelter has dropped precipitously, from 495 spaces in late 1994 to only 139 in May 1995. WLCH III, 918 F.Supp. at 447. Moreover, neither District statutes nor implementing regulations set forth standards or procedures for allocating scarce shelter space among eligible families. The city has left that matter to the discretion of the Shelter Office. When appellants filed this lawsuit, for example, the Shelter Office used a first-come, first-served system for allocating emergency shelter. Homeless families camped out overnight outside the Shelter Office attempting, often fruitlessly, to. secure priority in the application process. WLCH III, 918 F.Supp. at 446. Families found eligible for shelter on one day but turned away for lack of space *-1539 returned to square one the next morning, competing for priority with other rejected families as well as with families entirely new to the process. Id. Under this system, not all eligible families received shelter. As in Thompson, although the “substantive predicates” conferring eligibility might be present, a “particular outcome” might not follow. 490 U.S. at 463, 109 S.Ct. at 1910.
In early 1994, the Shelter Office abandoned the first-come, first-served system, replacing it with the wait-list procedures currently in effect. Now, all eligible families remaining on the waiting list eventually receive shelter. If this procedure were mandated by statute or regulation, eligible homeless families might well have a constitutionally protected entitlement to shelter, even though delay between application and shelter would almost always occur.
But D.C. law does not mandate the wait-list system. Like the pre-1994, first-come, first-served system, the wait-list procedures are informal office policy, WLCH .III, 918 F.Supp. at 445 & n. 13, and nothing in governing statutes or regulations prohibits the Shelter Office from again changing its allocation procedures. The Shelter Office could return to the first-come,, first-served daily system; it could give priority to families with infants or disabled children; or it could select applicant families at random from a rolling eligibility list. See Appellant’s Reply Br. at 13-14. Under the first and third options, some eligible families — those whose names were not called — would never receive shelter, at least as long as shelter supplies remain limited. Under the second option, families having neither infant nor disabled children might or might not receive shelter. As these examples illustrate, the Shelter Office is free to adopt an allocation system under which not all eligible families receive emergency shelter. Indeed, the District candidly acknowledges its “indifferen[ce] to which families, among those eligible for shelter, actually receive it.” Appellant’s Br. at 35. Under these circumstances, we hold that eligible homeless families lack the “legitimate claim of entitlement” necessary to create a constitutionally protected property right. Roth, 408 U.S. at 577, 92 S.Ct. at 2709.
Relying on traditional property law and citing for illustration contingent remainders, vested remainders subject to defeasance, and executory interests, the dissent hrgues that a property right can exist even though eligible families might not receive shelter. Dissent op. at 40-41. In the realm of real property law, it is certainly true that improbability of vesting will not defeat a contingent future interest in property. See id. at 40-41 nn.2-4. The question in this ease, however, is not whether eligible families have a legally enforceable future interest in emergency shelter, but whether they have a constitutionally enforceable property right to emergency shelter. The common law of real property, where uncertainty of future vesting merely reduces the value of property, does not answer that question. Instead, we must look to principles of due process, where the uncertainty of shelter due to the exercise of administrative discretion prevents the creation of a constitutionally protected entitlement. The Supreme Court recognized a constitutionally protected property right in Goldberg because administrators had no discretion in the allocation of AFDC benefits — all statutorily eligible individuals automatically received benefits. 397 U.S. at 262, 90 S.Ct. at 1017. By comparison, relying on Olim, 461 U.S. at 249, 103 S.Ct. at 1747-48, we held in Tarpeh-Doe that the regulations at issue there “failfed] to restrict sufficiently the decisionmaker's discretion to generate a protected [liberty or property] interest implicating the due process clause.” 904 F.2d at 723.
Pointing to procedures available to eligible families denied shelter, the dissent argues that the Shelter Office has insufficient discretion to defeat a constitutionally protected property right. Dissent op. at 41-42. Acting on behalf of its clients, the Clinic regularly uses those procedures, often successfully, to challenge administrative determinations of ineligibility. See supra, dissenting op. at p. 41. Such procedures, however, do not restrict the discretion the City Council has left to administrators to select the method of allocating scarce shelter space among eligible families, and it is the presence of that discretion which precludes a finding of an entitle *-1538 ment to emergency shelter. That eligible families reaching the top of the wait-list now receive shelter is of no constitutional significance becauáe the Shelter Office can change its procedures tomorrow. See White v. Office of Personnel Management, 787 F.2d 660, 666 (D.C.Cir.1986) (disappointed applicant for administrative law judge position had no property interest in spot at top of selection register; government could change its procedures without prior notice and hearing). The dissent views this as an “extreme notion,” Dissent at 45, but the notion is not ours. The District has chosen to leave just this kind of discretion in the hands of its administrators.
We agree with the dissent that in certain circumstances property rights may arise from administrative “rules or understandings.” Roth, 408 U.S. at 577, 92 S.Ct. at 2709; Perry v. Sindermann, 408 U.S. 593, 599-601, 92 S.Ct. 2694, 2698-2700, 33 L.Ed.2d 570 (1972); see Dissent at 43-45. Equally clearly, however, administrative actions may not create property rights where that result would “contravene the intent of the legislature.” Carducci v. Regan, 714 F.2d 171, 177 (D.C.Cir.1983). Here, the City Council’s intent is plain: “Nothing in this chapter shall be construed to create an entitlement in any homeless person or family to emergency shelter-” D.C.Code § 3-206.9(a); see also id. § 3-609 (same). While we doubt that blanket “no-entitlement” disclaimers can by themselves strip entitlements from individuals in the face of statutes or regulations unequivocally conferring them, the District’s “no-entitlement” disclaimer reinforces our conclusion that District of Columbia law, by leaving allocation of limited shelter among eligible families to administrative discretion, creates no constitutionally protected entitlement to emergency shelter. Moreover, outside the employment context, we have found no decision of the Supreme Court or of this Circuit holding that administrative rules or understandings existing wholly apart from legislation or regulations may create a property interest. We are not surprised by the lack of such decisions. In the absence of special circumstances neither alleged nor present in this case, such as where reliance on administrative action creates contractual responsibilities, obligations enforceable against the public fisc, i.e., entitlements, may arise only from the people acting through their legislators, not from administrative fiat. See Carducci 714 F.2d at 176-77.
Ill
We turn next to the district court’s ruling invalidating the city’s policy allowing unsolicited advocates to visit the Shelter Office waiting room only during certain hours of the week. The Clinic does not challenge the district court’s finding that the Shelter Office is a nonpublie forum, nor its ruling sustaining the limit to one unsolicited volunteer at a time.
In a non-public forum, restrictions on First Amendment activity “ ‘need only be reasonable.’ ” United States v. Kokinda, 497 U.S. 720, 730, 110 S.Ct. 3115, 3121-22, 111 L.Ed.2d 571 (1990) (plurality opinion) (emphasis omitted) (quoting Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 808, 105 S.Ct. 3439, 3452, 87 L.Ed.2d 567 (1985)); Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 955-56, 74 L.Ed.2d 794 (1983). According to the District, limiting unsolicited advocates’ access to the Shelter Office waiting room prevents overcrowding there and protects vulnerable families from disruptive solicitation by advocates for the homeless. We think neither rationale supports the policy. Sustained by the district court and unappealed by the Clinic, the policy limiting unsolicited volunteers to one at a time in the waiting room completely guards against overcrowding. And unless applicants for shelter are somehow less vulnerable on Wednesday mornings and Tuesday and Friday afternoons, we fail to see how barring access during the rest of the week enhances client protection. If the Shelter Office is so concerned about overcrowding and client vulnerability, moreover, we do not understand *-1537 why it does not enforce the challenged policy; according to the record, the Office currently allows unsolicited advocates in the waiting room whenever the Office is open. Appellant’s Br. at 28 n.7. Because the District has offered no tenable reasons for restricting access to the Shelter Office waiting room to only three periods per week, we agree with the district court that the restriction violates the First Amendment.
As an alternative justification for its policy, the District argues that because the Supreme Court has sustained total bans on financial solicitation in airports and outside post offices, see International Soc. for Krishna Consciousness, Inc. (ISKCON) v. Lee, 505 U.S. 672, 683-84, 112 S.Ct. 2701, 2708-09, 120 L.Ed.2d 541 (1992); Kokinda, 497 U.S. at 784, 110 S.Ct. at 3123-24, its partial ban on access to the waiting room likewise satisfies constitutional standards. Although we doubt the validity of this argument — it disregards the obvious difference between soliciting money and offering assistance to homeless families — we need not address it. Whether partial or total, limitations on First Amendment activity in a nonpublie forum must be reasonable. Kokinda, 497 U.S. at 730, 110 S.Ct. at 3121-22. The District offers no justification at all for a total ban and, as we have held, its reasons for the partial ban are unconvincing.
IV
In a footnote to the “Conclusion” section of its brief, the District makes one final request: that we vacate the district court’s declaratory judgment that the city violated D.C.Code Ann. § 3-206.3(a), requiring it to “claim federal financial participation to the extent allowable by law for housing assistance and services,” from July 1, 1993, until April 11, 1995. Contrary to Fed.R.Civ.P. 28(a)(3) and D.C.CiR. R. 28(a)(1)(B), however, the District did not include this argument in its statement of issues under review. Appellant’s Br. at 2. Moreover, the District offers only bare-bones arguments to support its request. Id. at 40-41 n. 10. Appellees responded to the District’s footnote with a terse footnote of their own on the last page of their brief. Appellees’ Br. at 38 n.ll. The District’s reply brief is silent on the issue. Because the District raises this issue in “such a cursory fashion,” we decline to resolve it. Texas Rural Legal Aid, Inc. v. Legal Servs. Corp., 940 F.2d 685, 697 (D.C.Cir.1991) (when appellant “eontent[s] itself with conclusory assertions” and appellees “d[o] not address the merits of the claim at all,” court normally will not address claim); see also Railway Labor Executives’ Ass’n v. United States R.R. Retirement Bd., 749 F.2d 856, 859 n. 6 (D.C.Cir.1984) (declining to resolve issue “on the basis of briefing which consisted of only three sentences ... and no discussion of the relevant statutory text, legislative history, or relevant ease law”).
V
We reverse the district court’s ruling that District law creates a property interest in emergency family shelter and remand for further proceedings in accordance with this opinion. We affirm the district court’s conclusion that the policy limiting unsolicited advocates’ access to the Shelter Office waiting room to certain times of the week violates the First Amendment.

So ordered.