254 F.3d 89 (D.C. Cir. 2001)
 Building Owners and Managers Association International, et al., Petitioners
v.
Federal Communications Commission and United States of America, Respondents
Satellite Broadcasting and Communications Association, et al., Intervenors
 No. 99-1009, No. 99-1021
 United States Court of Appeals FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued March 5, 2001
Decided July 6, 2001
 
 On Petitions for Review of an Order of the Federal Communications Commission
 Matthew C. Ames argued the cause for petitioners. With him on the brief were William Malone and Nicholas P. Miller.
 Gregory M. Christopher, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Christopher J. Wright, General Counsel, Daniel M. Armstrong, Associate General Counsel, A. Douglas Melamed, Acting Assistant Attorney General, United States Department of Justice, Robert B. Nicholson and Robert J. Wiggers, Attorneys. John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, Catherine G. O'Sullivan and Nancy C. Garrison, Attorneys, United States Department of Justice, entered appearances.
 Richard P. Bress argued the cause for intervenors, DIRECTV, Inc., et al. With him on the brief were James H. Barker, Margaret L. Tobey, Joan E. Neal, Cristina Chou Pauze, Timothy R. Graham, Joseph M. Sandri, Jr., Barry J. Ohlson, David Alan Nall, Jonathan Jacob Nadler and Benigno E. Bartolome, Jr. Philip L. Verveer and Theodore C. Whitehouse entered appearances.
 Before: Randolph, Rogers and Garland, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Rogers.
 Concurring opinion filed by Circuit Judge Randolph.
 Rogers, Circuit Judge:
 
 
 1
 Following enactment of the Telecommunications Act of 1996, the Federal Communications Commission promulgated a rule prohibiting restrictions on certain over-the-air reception devices ("OTARD"). The rule invalidated
 
 
 2
 [a]ny restriction, including but not limited to any state or local law or regulation, including zoning, land-use or building regulation, or any private covenant, homeowners' association rule or similar restriction on property within the exclusive use or control of the antenna user where the user has a direct or indirect ownership interest in the property that impairs the installation, maintenance, or use of [antennas that are designed to receive direct broadcast satellite service, video programming services via multipoint distribution services, or television broadcast signals]....
 
 
 3
 Preemption of Local Zoning Regulation of Satellite Earth Stations, Implementation of Section 207 of the Telecommunications Act of 1996: Restrictions on Over-the-Air Reception Devices: Television Broadcast Service and Multichannel Multipoint Distribution Service, 11 F.C.C.R. 19276 (1996) ("First OTARD Order"). In 1998, the Commission extended the prohibition, with certain exceptions, to "lease provision... where the [antenna] user has a ... leasehold interest in the property." In the Matter of Implementation of Section 207 of the Telecommunications Act of 1996--Restrictions on Over-the-Air Reception Devices: Television Broadcast, Multichannel Multipoint Distribution and Direct Broadcast Satellite Services, 13 F.C.C.R. 23874 (1998) ("Second OTARD Order").
 
 
 4
 Several trade associations representing real estate owners and property managers[1] appeal the Second OTARD Order, contending that the rule, as amended, is invalid on its face. They contend, first, that the Commission exceeded its statutory authority in extending the OTARD rule to leased property; second, that the amended rule violates the Takings Clause of the Fifth Amendment of the United States Constitution;[2] and third, if there is no taking, that the Commission acted arbitrarily and capriciously in extending the rule to leaseholds. Finding unpersuasive these facial challenges to the amended OTARD rule, we deny the petition.
 
 I.
 
 5
 In promulgating the OTARD rules, the Commission relied on 207 of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (the "1996 Act"), which provides:
 
 
 6
 Within 180 days after the date of enactment of this Act, the Commission shall, pursuant to Section 303 of the Communications Act of 1934, promulgate regulations to prohibit restrictions that impair a viewer's ability to receive video programming services through devices designed for over-the-air reception of television broadcast signals, multichannel multipoint distribution service, or direct broadcast satellite services.
 
 
 7
 The 1996 Act also added a new subsection 303(v) to the Communications Act of 1934, granting the Commission
 
 
 8
 exclusive jurisdiction to regulate the provision of directto-home satellite services ... [T]he term "direct-to-home satellite services" means the distribution or broadcasting of programming or services by satellite directly to the subscriber's premises without the use of ground receiving or distribution equipment . . . .
 
 
 9
 47 U.S.C. 303(v). The 1996 Act left undisturbed the broad statutory directives contained in the Communications Act of 1934, including the Commission's mandate to "make [communications services] available ... to all the people of the United States," 47 U.S.C. 151, and the Commission's authority to "perform any and all acts, make such rules and regulations, and issue such orders . . . as may be necessary in the execution of its functions." Id. 154(i).
 
 
 10
 As early as the 1980s, the Commission had begun restricting potential barriers to the development of satellite-based residential video programming. See, e.g., Preemption of Local Zoning or Other Regulation of Receive-Only Satellite Earth Stations, 51 Fed. Reg. 5519 (1986). In direct response to the directives in the 1996 Act, the Commission promulgated rules to safeguard viewers' ability to use devices designed for direct broadcast satellite services, television broadcast services, and multichannel multipoint distribution services (collectively, "s 207 devices"). See, e.g., Preemption of Local Zoning Regulation of Satellite Earth Stations, 11 F.C.C.R. 5809 (1996); Implementation of Section 207 of the Telecommunications Act of 1996: Restrictions on Over-the-Air Reception Devices: Television Broadcast and Multichannel Multipoint Distribution Service, Notice of Proposed Rulemaking, 11 F.C.C.R. 6357 (1996). The Commission adopted its first rule implementing 207 on August 5, 1996. See First OTARD Order, 11 F.C.C.R. 19276 (1996). The first OTARD rule provided:
 
 
 11
 Any restriction, including but not limited to any state or local law or regulation, including zoning, land-use or building regulation, or any private covenant, homeowners' association rule or similar restriction on property within the exclusive use or control of the antenna user where the user has a direct or indirect ownership interest in the property, that impairs the installation, maintenance, or use of [a 207 device] ... is prohibited....
 
 
 12
 47 C.F.R. 1.4000 (1996). The prohibitions in the first OTARD rule applied only to property in which the "user" of satellite services (i.e., the "viewer" for purposes of 207) had an ownership interest. Despite its stated prohibition of "any" restriction, the rule allowed for several exceptions: Restrictions on 207 devices were permissible if they served a "clearly defined safety objective" and were administered "in a nondiscriminatory manner to other . . . devices . . . that [we]re comparable in size, weight and appearance," or if they were "necessary to preserve an historic district," and if the restrictions were no more burdensome than necessary. Id. 1.4000(b)(1)-(3).[3] In addition, the OTARD rule permitted waiver by the Commission upon the request of local governments or associations. See id. 1.4000(c).
 
 
 13
 The first OTARD rule left unresolved whether the 207 prohibition should apply to "property not within the exclusive [use or] control of a person with an ownership interest," such as common areas or rental properties. First OTARD Order, 11 F.C.C.R. at 19311; see also id. at 19314. On November 20, 1998, after notice and comment, the Commission expanded the OTARD prohibition to include restrictions on 207 reception devices on rental property that is within the exclusive use or control of the tenant who has a leasehold interest in the property. See Second OTARD Order, 13 F.C.C.R. 23874 (1998). The amended OTARD rule provides in relevant part:
 
 
 14
 (a)(1) Any restriction, including but not limited to any state or local law or regulation, including zoning, landuse, or building regulations, or any private covenant, contract provision, lease provision, homeowners' association rule or similar restriction, on property within the exclusive use or control of the antenna user where the user has a direct or indirect ownership interest or leasehold interest in the property that impairs the installation, maintenance, or use of [a 207 device] ... is prohibited....
 
 
 15
 47 C.F.R. 1.4000(a)(1) (1998) (new language italicized). Under the amended OTARD rule, tenants are able, subject to some restrictions, to install 207 devices "wherever they rent space outside of a building, such as balcony railings, patios, yards, gardens, or any other similar area" and, in some instances, inside rental units. Second OTARD Order, 13 F.C.C.R. at 23875.[4] The Commission did not, however, extend the OTARD rule to the placement of antennas on common property such as outside walls (where viewers may have access but not possession and exclusive rights of use or control) or restricted access areas such as rooftops (where viewers generally do not have access or possession). See id. at 23893 35.
 
 
 16
 Following the Commission's denial of petitions for reconsideration of the Second OTARD Order, petitioners filed this appeal.
 
 II.
 
 17
 Petitioners contend that the Commission exceeded its statutory authority by extending the OTARD prohibition to leased property. To determine whether the Commission acted within its legally delegated authority in promulgating the amended OTARD rule, the court employs the familiar test outlined by the Supreme Court in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984): If, through the Communications Act, Congress has spoken directly to the precise issue presented by petitioners, "that is the end of the matter," and the court defers to the "unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If, however, the Communications Act "is silent or ambiguous with respect to the specific issue" at hand, the Commission may exercise its reasonable discretion in construing the statute.[5] Id. As petitioners contend--and as the Commission implicitly concedes, see Second OTARD Order, 13 F.C.C.R. at 23880--the Communications Act does not explicitly address the landlord-tenant relationship, nor does it explicitly grant the Commission jurisdiction over the real estate industry, an area that is normally outside the Commission's scope of authority. See, e.g., Illinois Citizens Comm. for Broad. v. FCC, 467 F.2d 1397, 1400 (7th Cir. 1972). Hence, the court's focus is on whether, in implementing 207, the Commission reasonably interpreted its statutory authority. We look to the text of the Communications Act of 1934 and the Telecommunications Act of 1996, and to the legislative history of 207.
 
 
 18
 In enacting the Communications Act of 1934, Congress intended "to confer upon the Commission sweeping authority to regulate 'in a field of enterprise the dominant characteristic of which was the rapid pace of its unfolding.' " Office of Communication of the United Church of Christ v. F.C.C., 707 F.2d 1413, 1423 (D.C. Cir. 1983) (quoting National Broad. Co. v. United States, 319 U.S. 190, 219 (1943)). In accordance with this goal, the provisions of the Communications Act are "explicitly applicable to 'all interstate and foreign communication by wire or radio,' " and the Commission, being the "single Government agency with 'unified jurisdiction and regulatory power over all forms of ... communication,' " is granted "broad authority" to execute its mandate. United States v. Southwestern Cable Co., 392 U.S. 157, 167-68 (1968) (quoting 47 U.S.C. 152(a)) (footnotes omitted); see also Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 700 (1984); Metropolitan Council of NAACP Branches v. FCC, 46 F.3d 1154, 1162 (D.C. Cir. 1995); United Video, Inc. v. FCC, 890 F.2d 1173, 1182-83 (D.C. Cir. 1989); National Ass'n of Regulatory Utility Comm'rs v. FCC, 746 F.2d 1492, 1499, 1501 (D.C. Cir. 1984); Wold Communications, Inc. v. FCC, 735 F.2d 1465, 1474-76 (D.C. Cir. 1984). The Communications Act thus directs the Commission to "perform any and all acts, make such rules and regulations, and issue such orders . . . as may be necessary in the execution of its functions." 47 U.S.C. 154(i); see also id. 303(r).
 
 
 19
 Congress continued in the 1996 Act to vest broad authority in the Commission, granting the Commission "exclusive jurisdiction to regulate the provision of direct-to-home satellite services," 47 U.S.C. 303(r), and instructing the Commission promptly to issue regulations to "prohibit restrictions" that impede "viewer[s]" from using 207 devices.[6] Id. 207. Consistent with the broad language of other sections of the Commission's enabling statute, Congress demonstrated no intent to qualify the terms "viewer" and "restrictions": It did not specify which types of "viewer[s]" were covered, or which types of "restrictions" were permissible. Had Congress intended to qualify these terms, it clearly would have done so, especially in light of the courts' expansive reading of Congress's previous delegations of authority to the Commission. See generally Commissioner v. Keystone Consol. Indus., 508 U.S. 152, 159 (1993); Cannon v. University of Chicago, 441 U.S. 677, 696-99 (1979); Lorillard v. Pons, 434 U.S. 575, 58081 (1978); Sea-Land Service, Inc. v. Department of Transp., 137 F.3d 640, 645-46 (D.C. Cir. 1998). Having "explicitly left a gap for [the Commission] to fill," Congress delegated to the Commission the authority to "elucidate 207] by regulation" and to "address[ ] ambiguity in the statute," United States v. Mead Corp., 121 S. Ct. 2164, 2171 (2001) (quoting Chevron, 467 U.S. at 843-44), and thus to preempt State enforcement of lease provisions that place "restrictions on viewers who wish to install, maintain, or use a ] 207 reception device within their leasehold."[7] Second OTARD Order, 13 F.C.C.R. at 23877.
 
 
 20
 The legislative history of 207 reinforces the conclusion that Congress intended in 207 to give the Commission a very broad mandate. The House Committee Report on 207 states that:
 
 
 21
 The Committee intends this section to preempt enforcement of State or local statutes and regulations, or State or local legal requirements, or restrictive covenants or encumbrances that prevent the use of antennae designed for off-the-air reception of television broadcast signals or of satellite receivers designed for receipt of [direct broadcast satellite] services. Existing regulations, including but not limited to, zoning laws, ordinances, restrictive covenants or homeowners' association rules, shall be unenforceable to the extent contrary to this section.
 
 
 22
 H.R. Rep. No. 104-204 at 123-24 (1995). Petitioners read this statement to reflect Congress's intent to prohibit only restrictions affecting property owners, such as zoning restrictions, covenants, and homeowners' association restrictions, thereby restoring those individuals' property rights. An equally plausible reading of the House Report--and one consistent with the broad authority reflected in the Commission's statutory mandate--would indicate Congress's intent to invalidate various types of private contracts under State law, such as homeowners' association contracts and lease agreements, that might interfere with a viewer's ability to receive certain types of satellite broadcasting signals.
 
 
 23
 Petitioners' essential claim is that however broad the Commission's mandate, it may only exercise its authority over "communications and persons . . . engaged in communications." 47 U.S.C. 152(a). This, petitioners contend, does not include either the real estate industry or the landlordtenant relationship, which is a legal allocation of property rights governed by State law. Petitioners rely on cases in which courts have denied the Commission the authority "to determine the validity of contracts between licensees and others," Regents of the Univ. Sys. of Georgia v. Carroll, 338 U.S. 586, 602 (1950), or to regulate any and all activities that "substantially affect communications." Illinois Citizens Comm. for Broad., 467 F.2d at 1400; see also Radio Station WOW v. Johnson, 326 U.S. 120, 131-32 (1945); Southwestern Bell Tel. Co. v. FCC, 19 F.3d 1475, 1484 (D.C. Cir. 1994). In contrast to those cases, however, the issue here is not the extent to which a ruling by the Commission affects areas that are tangential to the Commission's jurisdiction, such as the height and location of a building. See, e.g., Illinois Citizens Comm. for Broad., 467 F.2d at 1400. Congress has expressly vested the Commission with exclusive jurisdiction and authority to ensure that all viewers may access direct-to-home satellite services. See 47 U.S.C. 303(v); 1996 Act, Pub. L. No. 104-104, 207, 110 Stat. 56. Where the Commission has been instructed by Congress to prohibit restrictions on the provision of a regulated means of communication, it may assert jurisdiction over a party that directly furnishes those restrictions, and, in so doing, the Commission may alter property rights created under State law. See Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 368-69 (1986); Fidelity Fed. Savings and Loan Ass'n v. De la Cuesta, 458 U.S. 141, 153-54 (1982); Capital Cities Cable, 467 U.S. at 698-700; New York State Comm'n on Cable Television v. FCC, 749 F.2d 804, 807-08 (D.C. Cir. 1984).[8]
 
 
 24
 For these reasons, we hold that the Commission could reasonably construe 207 to apply to all "viewer[s]," including tenants, and to obligate the Commission to prohibit "[a]ny restriction," including lease provisions, "that impairs the installation, maintenance, or use of [a 207 device]." 47 C.F.R. 1.4000. It follows that the court properly defers to the Commission's interpretation of its statutory authority. See Mead Corp., 121 S. Ct. at 2171-73; Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125 (1985); see also United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 131 (1985).
 
 III.
 
 25
 Possibly foreseeing their fate under Chevron, petitioners contend that our analysis of the amended OTARD rule should be guided not by Chevron, but rather by the principles set forth in Bell Atlantic Telephone Companies v. FCC, 24 F.3d 1441 (D.C. Cir. 1994). In Bell Atlantic, the court declined to apply Chevron deference to a Commission order requiring the physical collocation of competitive access providers to the central offices of local telephone exchange companies. Faced with a similar statutory silence on the precise issue at hand, see id. at 1445, the court adopted a "narrowing construction" of the Communications Act[9] because the Commission's interpretation created an "identifiable class" of applications that would "necessarily constitute a taking." Id. at 1445-46 (quoting Riverside Bayview Homes, 474 U.S. at 128 n.5). Petitioners contend that, as in Bell Atlantic, the Commission's interpretation of 207 and of its authority under the Communications Act creates such an "identifiable class" and is therefore impermissible. Consistent with Supreme Court instruction, we disagree.
 
 
 26
 The first obstacle to petitioners' takings claim arises from their effort to classify the amended OTARD prohibition as a per se taking under Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982). In Loretto, the Supreme Court held that a "physical intrusion by government [is] a property restriction of an unusually serious character for purposes of the Takings Clause." Id. at 426 (internal quotations omitted). The Court further held that "when the physical intrusion reaches the extreme form of a permanent physical occupation, a [per se] taking has occurred." Id. Thus, in Loretto, the Supreme Court invalidated a New York statute authorizing a cable television company to place cable equipment onto a private property owner's building on the grounds that the statute constituted a per se taking. Id. at 438-39. Petitioners contend that a tenant's unauthorized use of the property, by installing a 207 device against the express wishes of the landlord, is an invasion of the property rights that the landlord has chosen to retain in the leased property and therefore amounts to a per se taking. Petitioners further contend that the amended OTARD rule constitutes a per se taking under Loretto because it enlarges the tenant's rights beyond the contractual provisions of the lease, thereby stripping landowners of property rights that they rightfully reserved, and constitutes a taking of the property owner's right to exclude. None of these contentions suffices to characterize the amended OTARD rule as a per se taking.
 
 
 27
 First, petitioners fail to acknowledge a key factor that places the amended OTARD rule outside the scope of Loretto: consent to the occupation of the property. The Loretto court emphasized that the per se taking rule is "very narrow" and applies only to regulations that "require the landlord to suffer the physical intrusion of his building by a third party." Id. at 440-41 (emphasis added). Unlike the building owner in Loretto, whose premises were occupied without her consent, the landlord subject to the amended OTARD rule has ceded control of his or her property to a tenant with whom the landlord has a contractual relationship. Thus, no "third party" stranger to the property is involved. While petitioners would label a tenant a "third party" intruder if the tenant uses the premises in a way that is prohibited by the lease, the Supreme Court has rejected this characterization. Consensual occupation of the property, as distinct from a "permanent physical occupation," Loretto, 458 U.S. at 426, occurs once the landlord voluntarily enters into a lease with the tenant. In FCC v. Florida Power Corp., 480 U.S. 245 (1981), for example, the Supreme Court upheld the Commission's authority under the Pole Attachments Act, 47 U.S.C. 224 (1991), to regulate pole rental fees paid to an electric utility by various cable television companies using the utility's poles.[10] The Court distinguished Loretto on the grounds that, unlike the New York statute that allowed cable companies to access an individual's property, the Pole Attachments Act did not authorize third parties to access the utility poles, but merely regulated the terms of the rental once cable companies and the utilities agreed to the rental of the poles. "Required acquiescence," the Court held, "is at the heart of the concept of occupation." Id. at 252. It is thus "the invitation, not the rent, that makes the difference. The line which separates [landlord-tenant] cases from Loretto is the unambiguous distinction between a commercial lessee and an interloper with a government license." Id. at 252-53 (emphasis added). As with the pole rentals in Florida Power, the landlord affected by the amended OTARD rule will have voluntarily ceded control of an interest in his or her property to a tenant. Having ceded such possession of the property, a landlord thereby submits to the Commission's rightful regulation of a term of that occupation.[11] See Florida Power, 480 U.S. at 252.
 
 
 28
 Second, petitioners ignore the extensive case law upholding the government's authority to regulate various aspects of the landlord-tenant relationship "without paying compensation for all economic injuries that such regulation entails," Loretto, 458 U.S. at 440, even though some of these regulations "transfer wealth from the one who is regulated to another." Yee v. City of Escondido, 503 U.S. 519, 529 (1992). Although a landlord's lease restrictions are enforceable property rights, see United States v. General Motors, 323 U.S. 373, 380-82 (1945), governmental restrictions on the exercise of those rights do not necessarily constitute a per se taking. For example, "[w]hen a landowner decides to rent his land to tenants, the government may place ceilings on the rents the landowner can charge, or require the landowner to accept tenants he does not like, without [creating a per se taking]." Yee, 503 U.S. at 529 (citations omitted); see also PruneYard Shopping Center v. Robins, 447 U.S. 74 (1980); Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 258 (1964); McAndrews v. Fleet Bank of Massachusetts, 989 F.2d 13 (1st Cir. 1993). In light of this precedent, regulation of a single aspect of the landlord-tenant relationship, enacted pursuant to the manifest congressional objective of safeguarding viewers' access to direct-to-home satellite services, does not result in a per se taking. See 47 U.S.C. §§ 151, 303(v).
 
 
 29
 Third, the Supreme Court has rejected the contention that regulation of the terms of a landlord-tenant relationship constitutes on its face an invasion of the landlord's right to exclude. See Yee, 503 U.S. at 527-28. In Yee, the Court held that a rent control ordinance affecting the owners of a mobile home park, even when considered in light of a State law restricting the landlords' right of eviction, did not constitute a taking of the landlords' right to exclude. See id. The Court stated that "no government has required any physical invasion of petitioners' property. Petitioners' tenants were invited by petitioners, not forced upon them by the government." Id. at 528 (citing Florida Power, 480 U.S. at 252-53). Consequently, "[w]hile the 'right to exclude' is doubtless ... 'one of the most essential sticks in the bundle of rights that are commonly characterized as property,' ... that right [was not] taken from petitioners on the mere face of the [regulation]." Id. (quoting Kaiser Aetna v. United States, 444 U.S. 164, 176 (1979)).
 
 
 30
 Because the amended OTARD rule does not amount to a compelled physical invasion of property,[12] and hence a per se taking, petitioners' only potential takings claim is a regulatory taking claim. That kind of claim requires "ad hoc, factual inquiries," Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124 (1978),[13] and "entails complex factual assessments of the purposes and economic effects of government action." Yee, 503 U.S. at 523. Because of this contextspecific standard, the amended OTARD rule cannot be said to create an "identifiable class" of applications that would "necessarily constitute a [regulatory] taking." Bell Atlantic, 24 F.3d at 1445-46 (quoting Riverside Bayview Homes, 474 U.S. at 128 n.5). For that reason, the Bell Atlantic approach to statutory interpretation does not apply, and the Chevron analysis of Part II does.
 
 
 31
 Petitioners' alternate claim that even if statutorily authorized, the amended OTARD rule is nonetheless an unconstitutional regulatory taking that must be set aside fails for two independent reasons. First, "in general, '[e]quitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to that taking.' " Riverside Bayview Homes, 474 U.S. at 127-28 (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016 (1984)); see also Bell Atlantic, 24 F.3d at 1445 n.1. Second, because petitioners' regulatory taking claim depends upon ad hoc, factual inquiries, it cannot satisfy the requirements for making the kind of facial challenge petitioners have brought here. See Yee, 503 U.S. at 533-34; Gulf Power Co. v. United States, 187 F.2d 1324, 1328 (11th Cir. 1999). Petitioners are still free to make claims for just compensation on account of regulatory takings with respect to their individual buildings, but no such claims have been made here, nor could they be. See Riverside Bayview Homes, 474 U.S. at 128, 129 n.6.
 
 IV.
 
 32
 As an apparent afterthought, petitioners summarily contend that in the absence of a taking, the Commission acted arbitrarily and capriciously, and abused its discretion, in promulgating the amended OTARD rule. Petitioners primarily quote what they consider a "tautology" from the Second OTARD Order: "Removing a restriction on installing an antenna within a leasehold does not impose a duty on the landlord to relinquish property because the landlord has already voluntarily relinquished possession of the leasehold by virtue of the lease." Second OTARD Order, 13 F.C.C.R. at 23881. This statement, petitioners assert, demonstrates that the Commission's rule is "purposeless or illogical": If the Commission "has taken nothing," petitioners ask, "then why is the rule necessary?" Petitioners have misconstrued the Commission's position.
 
 
 33
 Contrary to petitioners' assertion, the Commission does not argue that the landlord "gave [ ] away" a property right to the tenant by relinquishing possession of the property. Rather, the quoted statement represents the Commission's position, explained in detail in the subsequent paragraphs of the Second OTARD Order, that although a landlord may retain property interests in a leasehold, a restriction on the terms that the landlord may impose on the tenant is not a physical occupation giving rise to a per se taking because the landlord has "voluntarily relinquished possession" of the property. See Second OTARD Order, 13 F.C.C.R. at 23881-86.
 
 
 34
 Accordingly, because petitioners' facial challenge fails to present an "identifiable set of instances in which mere application of [the amended OTARD rule] will necessarily or even probably constitute a taking," Riverside Bayview Homes, 474 U.S. at 128 n.5, we apply Chevron deference to the Commission's interpretation of 207 and of its broad mandate under the Communications Act, and we deny the petition.[14]
 
 
 
 Notes:
 
 
 [1]
 Petitioners are the Building Owners and Managers Association International, the Institute of Real Estate Management, the National Apartment Association, the American Seniors Housing Association, the National Multi Housing Council, the National Association of Realtors, the Real Estate Roundtable, and the National Association of Home Builders.
 
 
 [2]
 "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V.
 
 
 [3]
 In the Second OTARD Order, the Commission amended 1.4000(b)(2) to except "a prehistoric or historic district, site, building, structure or object included in, or eligible for inclusion on, the National Register of Historic Places...."
 
 
 [4]
 For tenants who do not lease outside rental space, the Commission noted that "our new rules permit the installation of Section 207 devices inside rental units and anticipate the development of future technology that will create devices capable of receiving video programming signals inside buildings." Second OTARD Order , 13 F.C.C.R. at 23875-76. The Commission noted that one such device already permits inside receipt of signals. Id. at 23876.
 
 
 [5]
 The court properly applies Chevron analysis to the amended OTARD rule because "Congress delegated authority to [the Commission] generally to make rules carrying the force of law, and [the OTARD rule] was promulgated in the exercise of that authority." United States v. Mead Corp., 121 S. Ct. 2164, 2171 (2001); see also infra Part II.
 
 
 [6]
 The parties' discussion of 207 is not advanced by emphasis on whether 207 is properly labeled as a directive for the Commission to act pursuant to pre-existing authority, rather than as a source of independent authority. Whether 207 is viewed as new authority or as a directive to act upon existing authority, 207 suffices as a statutory basis for the Second OTARD Order. Moreover, petitioners' belittling of the significance of 207 on the ground that, unlike other sections of the 1996 Act, 207 is uncodified is misplaced; that the section was not codified in the United States Code does not detract from 207's legal authority. See United States Bank of Oregon v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 448 (1993).
 
 
 [7]
 The Commission's statutory authority is, of course, subject to limitations: It is "restricted to that reasonably ancillary to the effective performance of [its] various responsibilities." Southwestern Cable Co., 392 U.S. at 178. In light of Congress's explicit (and exclusive) grant of jurisdiction to the Commission over direct-tohome satellite services and its broad responsibility to make communications services available to all individuals, an OTARD rule that safeguards all viewers' access to these services clearly falls within this limitation.
 
 
 [8]
 Petitioners do not rely on 152(b) as a jurisdictional limitation on the Commission's authority to promulgate the amended OTARD rule. See Louisiana Pub. Serv. Comm'n., 476 U.S. at 369.
 
 
 [9]
 At issue in Bell Atlantic was the authority of the Commission, pursuant to 47 U.S.C. 201(a), to order carriers "to establish physical connections with other carriers."
 
 
 [10]
 The Court noted that the Pole Attachments Act was "enacted by Congress as a solution to a perceived danger of anticompetitive practices by utilities in connection with cable television service." Florida Power, 480 U.S. at 247. Prior to that enactment, utility companies had leased the space on their poles to cable operators, who claimed that "the utility companies were exploiting their monopoly position by engaging in widespread overcharging...." Id. The Commission states in its brief that petitioners are building owners who seek to maintain bottleneck control over access to rental buildings by cable and satellite master antenna operators of the building owners' choosing. See Br. for Respondent at 11-12. The court has no occasion to evaluate this statement.
 
 
 [11]
 Contrary to petitioners' contention, Gulf Power Co. v. United States, 187 F.3d 1324 (11th Cir. 1999), does not imply a different result. In Gulf Power, the Eleventh Circuit held that a 1996 amendment to the Pole Attachments Act, providing that utilities must provide telecommunications carriers access to their utility poles, ducts, conduits, and rights-of-way, effected a per se taking of the utility's property. See id. at 1329; see also 47 U.S.C. 224(f)(1). The court concluded that the 1996 amendment "require[d] a utility to acquiesce to a permanent, physical occupation of its property" by a third party. Id. at 1329. This element of "required acquiescence," the court observed, distinguished the case from Florida Power and brought the amended statute within the scope of Loretto. Id. at 1329 (quoting Florida Power, 480 U.S. at 252).
 
 
 [12]
 In the Second OTARD Order, the Commission recognized the limitations of its new mandate:
 In [s] 207, Congress did not direct the Commission to impose affirmative duties on other parties to install [s] 207 devices or to grant access to restricted areas to permit the installation of [s] 207 reception devices, and in particular, Congress did not direct the Commission to require property owners to subject property to a Fifth Amendment taking.
 Second OTARD Order, 13 F.C.C.R. at 23877.
 
 
 [13]
 To determine whether a regulation constitutes a regulatory taking, the court generally evaluates three factors: (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) the "character of the governmental action." Penn Central, 438 U.S. at 124.
 
 
 [14]
 In a footnote to their brief, petitioners contend in two brief sentences, without supporting citation, that the amended OTARD rule is void for vagueness. The court declines to address an issue that was presented in such a cursory fashion. See Washington Legal Clinic for the Homeless v. Barry, 107 F.3d 32, 39 (D.C. Cir. 1997).
 
 
 Randolph, Circuit Judge, concurring:
 
 35
 While I join all of the court's opinion, I write separately to express my opinion that Bell Atlantic Telephone Cos. v. FCC, 24 F.3d 1441 (D.C. Cir. 1994), was wrongly decided and ought to be overruled.
 
 
 36
 Our opinion in Railway Labor Executives Ass'n v. United States, 987 F.2d 806, 815-16 (D.C. Cir. 1993) (per curiam), issued shortly before Bell Atlantic, summarized the governing principles: "The Fifth Amendment guarantees that when the government takes private property, it will provide just compensation. Under the Tucker Act, 28 U.S.C. 1491(a), the United States Court of Federal Claims has original jurisdiction over suits seeking compensation from the United States under the Constitution. Except for cases in which the amount in controversy is less than $10,000, in which event jurisdiction is concurrent with the federal district courts, see 28 U.S.C. 1346(a)(2), the Federal Claims Court's jurisdiction in such actions is exclusive. '[T]akings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act.' Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195 (1985)."
 
 
 37
 "... The Taking Clause does not prohibit the government from taking private property. The Clause requires only that the government accomplish the taking in a particular way, namely, by paying for the property. See First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 314-15 (1987); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1020 (1984). There is no constitutional necessity for payment to be made in advance, at least so long as the government provides a way for the property owner to recover just compensation after the taking is completed. See Ruckelshaus, 467 U.S. at 1016. As we have said, those adversely affected by the Commission's action may pursue their claims in the Federal Claims Court or, depending on the amount at stake, in the federal district courts."
 
 
 38
 "There is nothing to petitioners' further point that, at the least, we ought to construe [the statute] to avoid the possibility that the [agency] has effectuated a taking in this case. The argument may rest on the familiar canon that if one permissible interpretation of statute would render it unconstitutional and another permissible interpretation would make it constitutional, the latter should prevail because the judiciary should not assume Congress meant to violate the Constitution. Blodgett v. Holden, 275 U.S. 142, 147-49 (1927) (opinion of Holmes, J.). Or the argument may rely on the more debatable canon of construing statutes to avoid constitutional doubts. Compare Johnson v. Robison, 415 U.S. 361, 366-67 (1974), with Rust v. Sullivan, 500 U.S. 173, 190-91 (1991). But these canons do not fit. Because just compensation is presumptively available under the Tucker Act, there is neither an unconstitutional result nor a constitutional doubt to be averted by interpretation. See United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 127-28 (1985)."
 
 
 39
 Doubtless in recognition of these principles, Bell Atlantic begins with a disclaimer and then adds a qualifier: this court has no "power" to decide whether an agency regulation rule "inflicted" a taking of private property within the meaning of the Fifth Amendment to the Constitution--if the regulation was within the agency's statutory authority. 24 F.3d at 1444 n.1. How to determine the "if"? According to Bell Atlantic, not in the usual deference-laced manner because "statutes will be construed to defeat administrative orders that raise substantial constitutional questions," id. at 1445. That point is directly contrary to Railway Labor's recognition that there is no constitutional doubt to be avoided. And it is also directly contrary to the Supreme Court's holding in United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 128 (1985), that "the possibility that the application of a regulatory program may in some instances result in the taking of ... property is no justification for the use of narrowing constructions to curtail the program if compensation will in any event be available in those cases where a taking has occurred."
 
 
 40
 Bell Atlantic's other rationale for adjudicating whether a regulation would take property, and for construing the statute to prevent this, stems from a footnote in Riverside Bayview Homes, Inc., 474 U.S. at 128 n.5. The Supreme Court there distinguished United States v. Security Industrial Bank, 459 U.S. 70, 78 (1982), on the basis that statutory interpretation might be affected if "there is an identifiable class of cases in which application of a statute will necessarily constitute a taking." The Court described Security Industrial Bank as a case in which a narrowing construction was appropriate because "a particular provision of the Bankruptcy Code would in every case constitute a taking." Id. This is reflected in the Court's expression of doubt in Security Industrial Bank whether so applying a Code provision "comports with the Fifth Amendment." 459 U.S. at 78. Given the Court's analysis in Riverside Bayview--namely, that only an uncompensated taking of private property could violate the Fifth Amendment--the statement in Security Industrial Bank just quoted has to mean that there would have been no just compensation for the threatened takings, or that the Court thought there would not be. This reading is supported by Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935), the case Security Industrial Bank relied upon and reaffirmed. Radford invalidated a retroactive change in the bankruptcy laws permitting debtors to retain their property more easily because the "Act as applied ha[d] taken from the Bank without compensation." Id. at 601 (emphasis added).
 
 
 41
 In this case there is no doubt that if a taking occurs as a result of the Commission's rule, the property owner may receive just compensation. See maj. op. at 17. To my mind, that ought to end the takings inquiry. I recognize that Bell Atlantic treats the matter very differently: "Chevron deference to agency action that creates a broad class of takings claims, compensable in the Court of Claims, would allow agencies to use statutory silence or ambiguity to expose the Treasury to liability both massive and unforeseen." Bell Atlantic, 24 F.3d at 1445. In other words, the fact that compensation would be available is a reason for a narrowing construction--the opposite of what the Supreme Court held.
 
 
 42
 But my disagreement with Bell Atlantic's theory rests on more than just its misreading of the Supreme Court's opinion in Riverside Bayview. It is not clear to me how, in many instances, we could determine whether an agency rule would bring about a taking in a "broad" class of cases (a term not used in Riverside Bayview). Bell Atlantic makes no distinction between regulatory and per se takings; whether a regulatory taking has occurred may depend on the "background principles" of each state's property law. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1031 (1992). In how many states, or in how many instances, there must be a taking before we find a "broad class of takings" under Bell Atlantic is a mystery.
 
 
 43
 I also disagree with the rationale, relied upon in Bell Atlantic, that it is the business of the federal courts to protect the government from some imagined risk of agency encroachment on Congress's taxation and appropriations powers. By passing the Tucker Act, Congress generally bound itself to paying for authorized takings by the federal government, regardless whether the specific liability in any particular case was intended or foreseen. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 126-27 (1974). While it may be the case that the courts must protect one branch from the aggrandizing actions of another, see generally Mistretta v. United States, 488 U.S. 361, 380-84 (1989) (collecting cases), surely it is not the case that the courts must protect Congress from creating responsibilities for itself (so long as they do not detract from the other branches' powers or violate the delegation doctrine). Since the political branches have made a legislative choice to accept federal liability for takings, the federal courts must respect that determination. Besides, if Congress disagrees with an agency's subjecting the Treasury to liability through taking claims, it can always reverse the agency's rule through legislation, either before the rule takes effect, see Congressional Review Act, Pub. L. No. 104-121, tit. II, 251, 110 Stat. 868 (1996) (codified at 5 U.S.C. §§ 801808), or afterwards.
 
 
 44
 Given the opportunity, I would vote to overturn Bell Atlantic.